**Richard J. SEGAL, Judith Segal, Joe Fogarty, and Nancy Fogarty, Appellants,**

v.

**EMMES CAPITAL, L.L.C., Appellee.**

No. 01–01–00460–CV.

Court of Appeals of Texas, Houston (1st Dist.).

March 11, 2004.

Allyson L. Mihalick, Jeff Nobles, Beirne, Maynard & Parsons, L.L.P., Karl Vernon Hopkins, Brendan D. Cook, Baker & McKenzie, Steven E. Halpin, Steven E. Halpin, P.C., Houston, TX, for Appellant.

Kenneth E. McKay, Locke, Liddell & Sapp, LLP, Houston, TX, Thomas H., Jr. Broookman, Fort Worth, TX, for Appellee.

Panel consists of Justices NUCHIA, ALCALA, and HANKS.

## OPINION ON REHEARING

SAM NUCHIA, Justice.

Appellants Richard J. Segal and Judith Segal ("the Segals") have moved for rehearing, as have appellants Joe Fogarty and Nancy Fogarty ("the Fogartys"). Appellee, Emmes Capital, L.L.C. ("Emmes"), has responded to both rehearing motions. We have granted the Segals' unopposed motion to supplement the appellate record on rehearing. We now grant the rehearing motions. Although we withdraw our opinion and judgment dated October 10, 2002 and issue this opinion and judgment in their place, our ultimate disposition of the trial court's judgment remains unchanged.

The Segals and the Fogartys (collectively, "appellants") appeal a judgment rendered after the trial court granted the summary judgment motion of Emmes and denied the Segals' and the Fogartys' summary judgment motions. We affirm.

## I. Standard of Review and Burden of Proof

We follow the usual standard of review for an order granting one party's summary judgment motion, and denying other parties' summary judgment motions, under rule 166a(c) without specifying grounds. *See* TEX.R. CIV. P. 166a(c); *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001) (summary judgment order not specifying grounds); *Bradley v. State ex rel. White,* 990 S.W.2d 245, 247 (Tex.1999) (order granting and denying cross-motions for summary judgment); *Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex. 1997) (standard of review and burden under rule 166a(c)).

## II. Background

The Fogartys and the Segals had ownership interests in Jojac/Sejac, Ltd., a limited partnership ("the borrower"). To purchase three pieces of real estate in Texas, the borrower executed a promissory note ("the note") for $6,850,000 in favor of Emmes. On the same day, the borrower secured the note by a first lien, conveyed by

a deed of trust ("the deed of trust") in Emmes's favor, on the three properties. Also on the same day, appellants executed an unconditional guaranty agreement ("the guaranty"), by which each agreed to be jointly and severally liable for, among other things, "any liability of the Borrower to [Emmes] pursuant to any documents executed and/or delivered in connection with any indebtedness of the Borrower to [Emmes]," including the "debt secured" portion of the deed of trust.

The note matured in 1998, and the borrower defaulted. In the spring of 1999, the borrower filed for Chapter 11 bankruptcy. Apparently because the bankruptcy stayed enforcement actions against the borrower and its collateral, Emmes sued the Segals and the Fogartys in New York ("the New York suits") in April 1999 to recover on the guaranty. *See* N.Y. C.P.L.R. § 3213 (McKinney 1992). In June and August 1999, the trial court in the New York suits rendered two judgments for Emmes against all appellants for a total of $4,609,076.77. In July 1999 and May 2000, respectively, Emmes sought to domesticate and to enforce the New York suit judgments in Texas by a lawsuit styled *Emmes Capital, L.L.C. v. Joe Fogarty et al.*, cause no. 1999–38061, in the 281st District Court of Harris County, Texas ("the first Texas suit"). *See* TEX. CIV. PRAC. & REM.CODE ANN. § 35.001–.008 (Vernon 1997).

On September 10, 1999, the bankruptcy court entered an order, agreed to by the borrower, Emmes, and appellants, modifying the automatic bankruptcy stay ("the agreed bankruptcy order"). The agreed bankruptcy order provided, among other things, that, if the borrower did not pay Emmes the remaining amount owing on

the note by December 3, 1999, the automatic stay would lift to allow Emmes to foreclose on the deed-of-trust property on December 7, 1999.

The borrower paid some, but not all, of the debt, and the stay thus lifted automatically. Emmes sold the three deed-of-trust properties by non-judicial foreclosure sale on December 7, 1999 in Harris County. Emmes was the high bidder on all three properties, purchasing them for $1,550,000 total. The parties and the record are unclear about how much deficiency remained after the foreclosure sales, but a deficiency did remain.

In early 2000, the Fogartys and the Segals counterclaimed against Emmes in the first Texas suit, alleging that the three properties were sold for less than fair-market value and seeking a determination and declaration under Texas law of the properties' fair-market value and an offset in that amount from any deficiency judgment. *See* TEX. PROP.CODE ANN. § 51.005 (Vernon 1995) (allowing guarantor to challenge fair-market value of property sold in non-judicial foreclosure sale as prelude to seeking offset from deficiency amount). The Segals expressly pleaded Property Code section 51.005.

On February 2, 2000, shortly after having filed their counterclaim in the first Texas suit, the Fogartys filed their own suit against Emmes—*Joe Fogarty & Nancy Fogarty v. Emmes Capital, L.L.C.*, cause no. 20009–06408, in the 281st District Court of Harris County, Texas ("the second Texas suit")—for a determination of the three properties' fair-market value and an offset in that amount from any deficiency judgment.[1] The Segals inter-

---

1. The second Texas suit was originally filed in the 270th District Court of Harris County, Texas, but was transferred to the 281st District Court, in which the first Texas suit had been filed, on February 9, 2000. Thereafter, both the first and the second Texas suits were

vened in the second Texas suit on March 1, 2000, requesting the same determination and declaration as the Fogartys did and, again, expressly referencing Property Code section 51.005. The parties agree that the first and the second Texas suits had substantially identical parties and issues. This appeal is from the final judgment in the second Texas suit, and the remainder of this opinion concerns that suit's procedural history.[2]

■ The parties then filed various summary judgment pleadings. Before discussing those pleadings, we note that, in the second Texas suit, with few exceptions, the parties filed summary judgment motions and responses that did not themselves state any grounds, but that instead incorporated by reference equivalent motions or responses from the first Texas suit or from their or other parties' summary judgment motions or responses in the second Texas suit. Normally, summary judgment grounds must be stated in the motion itself, not in an attached brief or evidence, and no special exception would be required to preserve an appellate complaint about a total lack of grounds in the motion. *See McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 342 (Tex.1993). However, all parties used the incorporation-by-reference procedure below without objection, and, more importantly, no party complains on appeal of any other party's use of the incorporation-by-reference procedure. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex.1993) (holding that appellate court cannot reverse judgment for reason not raised in point of error).

Emmes moved for rule–166a(c) summary judgment on the ground that appellants had waived their rights under Property Code section 51.005 (fair-market-value determination) by express waiver in the guaranty. The Fogartys' summary judgment response claimed that the guaranty's waiver of a fair-market-value determination and an offset under section 51.005 (1) violated Texas's public policy and (2) was invalid because the rights that it waived did not exist when the waiver was signed.[3] The Fogartys' response expressly stated that the "issue presented is whether a guarantor's waiver of his right to determi-

---

considered by the judge of the 281st District Court.

**2.** The trial court granted Emmes's summary judgment motion in the second Texas suit on March 5, 2001, the same date that the court entered final judgment in the first Texas suit. (The court apparently found the rendition of summary judgment in the second Texas suit to be dispositive of the first Texas suit's issues.) The trial court rendered final judgment in the second Texas suit on April 20, 2001. During a status conference in this Court, and later memorialized by written agreement filed in this appellate cause, the parties agreed as follows: the appeal of the first Texas suit, which had been transferred to another court of appeals, would be dismissed; any appellate issue for any party that could have been asserted in the appeal of the first Texas suit could be asserted in the appeal of the second Texas suit; and the parties could supplement the clerk's record in the appeal of the second Texas suit with any required documents from the first Texas suit. Before our original opinion issued, the Segals supplemented our record with some items from the first Texas suit's record. On rehearing, we granted the Segals' unopposed motion to supplement our record with the entire record from the first Texas suit. Pursuant to the parties' agreement filed in this Court, we consider summary judgment arguments raised in the first Texas suit when those arguments are asserted again in this appeal.

**3.** In their own summary judgment response, the Fogartys adopted the Segals' summary judgment response by reference. The Segals' summary judgment response, in turn, raised two grounds (ambiguity and lack of conspicuousness) that were not expressly raised in the Fogartys' response. However, the Fogartys do not assert any appellate challenges based on the those two additional grounds found in the Segals' summary judgment response.

nation of the fair market value ... pursuant to Tex. Prop.Code. Ann. § 51.005 (Vernon 1995) is enforceable." The Fogartys admitted in their response that their claim was for a determination "pursuant to Tex. Prop.Code Ann. § 51.005." The Segals also responded to Emmes's summary judgment motion about the same time,[4] arguing that the guaranty's waiver of a fair-market-value determination and an offset under section 51.005 (1) was void for violating Texas's public policy, (2) was ambiguous, and (3) was unenforceable for not being conspicuous.[5]

The trial court did not rule on Emmes's summary judgment motion at the scheduled hearing, but instead allowed appellants additional time to file their own rule 166a(c) summary judgment motions. Thereafter, the Fogartys amended their petition, seeking the following, alternative declarations:

1. A declaration that New York law (specifically, a deficiency-law defensive bar) precluded a deficiency judgment and required that the properties' sale price be deemed in full satisfaction of the debt.

2. A declaration of the properties' fair-market value and of any offset to which the Fogartys were entitled from a deficiency judgment.

On the same day that they amended their petition, the Fogartys moved for partial summary judgment on the ground that the note, deed of trust, and guaranty provided that New York law applied to any deficiency action; that Emmes did not comply with New York deficiency law; and that Emmes was thus barred entirely from seeking any deficiency judgment. They also moved for summary judgment on the ground that the foreclosure sales of some of the properties were void under Texas law for allegedly having taken place in the wrong county. The Segals later moved for summary judgment on essentially the same grounds as had the Fogartys, the only substantive difference being that the Segals' motion asserted that the two foreclosure sales were either void or voidable.[6]

4. Nothing shows that the Segals filed a response to Emmes's summary judgment motion in the second Texas suit. (The Segals' opening brief stated that they had filed a response in the second Texas suit, but the record to which they cited was Emmes's summary judgment motion; moreover, the Segals's designation of record in the second Texas suit does not clearly ask for inclusion of any such response in our appellate record.) And although the Segals designated their summary judgment response filed in the first Texas suit to be included in *that* suit's appellate record, they did not request that that response be included in our appellate record or advise us that they had filed a response in that suit, despite having supplemented our appellate record before submission with other documents from the first Texas suit. Accordingly, in our original opinion, we held that the Segals had waived some of their appellate challenges for not having raised them below. *See McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 342 (Tex.1993) (holding that non-movant who does not respond to motion may argue on appeal only that motion's grounds were legally insufficient). On rehearing, and in the interests of justice, we granted the Segals' unopposed motion to supplement our record with records from the first Texas suit that contains the Segals' original and supplemental summary judgment responses. Pursuant to the parties' agreement in this Court, we thus now consider all arguments that the Segals raised in their responses in the first Texas suit.

5. The Segals' response also asserted that the guaranty's clause waiving their valuation and offset rights under section 51.005 was superseded or modified by the agreed bankruptcy order. However, the Segals do not reassert that argument by issue on appeal.

6. The Segals did not amend their intervention plea to request a declaration concerning their defense under New York law. However, we may presume that the parties tried by consent any New-York–deficiency-law matters with respect to the Segals because the Segals

Emmes responded to appellants' summary judgment motions by arguing that (1) Texas law, not New York law, applied to any deficiency action; (2) alternatively, even if New York deficiency law applied, appellants had waived any protections under New York deficiency law through a waiver in the agreed bankruptcy order; and (3) the foreclosure sales for all three properties were properly held in Harris County.[7]

The trial court granted Emmes' summary judgment motion and denied appellants' summary judgment motions without specifying grounds, effectively overruling appellants' challenges to the deficiency remaining after the non-judicial foreclosure sale.

moved for summary judgment on the same New–York–deficiency–law grounds that the Fogartys had pleaded and Emmes did not object or specially except. *See Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 495 (Tex.1991) (holding that trial by consent of unpleaded matters applies in summary judgment context).

7. Actually, when Emmes filed its summary judgment response, only the Fogartys had moved for summary judgment. However, Emmes's response stated that it was made to "Plaintiffs' motions" for summary judgment, the Segals filed their summary judgment motion within two months after Emmes filed its response, and all parties appear to treat Emmes as having responded to both summary judgment motions by both pairs of appellants. The confusion in timing appears to have resulted from the Segals' having moved for summary judgment in the first Texas suit before Emmes responded in the second Texas suit and to the parties' having treated the two suits as if they had been consolidated.

8. The Segals' first and second issues technically complain only that the trial court erred in "granting summary judgment" for Emmes, but liberally construing the argument under those issues, we conclude that the Segals are also complaining of the denial of their own summary judgment motion on this ground. *See* Tex.R.App. P. 38.1(e), 38.9.

## III. Appellants' Challenges to the Deficiency Judgment

### A. Appellants' Challenges Under New York Deficiency Law to Emmes's Seeking Any Deficiency Judgment

■ In the Fogartys' first issue and the Segals' first and second issues, appellants claim that the trial court erred in rendering summary judgment for Emmes, denying the Fogartys' motion for partial summary judgment, and denying the Segals' motion for summary judgment[8] because (1) New York deficiency law applied, (2) Emmes did not comply with New York deficiency law because Emmes did not move to confirm the foreclosure sales timely,[9] and (3) Emmes was thus barred from seeking any deficiency judgment at all.

9. New York deficiency law places the burden on the creditor to seek a deficiency judgment within 90 days after the foreclosure sale on mortgaged property or be barred from seeking a deficiency judgment at all:

1. If a person who is liable to the plaintiff for the payment of the debt secured by the mortgage is made a defendant in the action ... the final judgment may award the payment by him of the whole residue, or so much thereof as the court may determine to be just and equitable, of the debt remaining unsatisfied, after a sale of the mortgaged property and the application of proceeds, pursuant to the directions contained in such judgment, the amount thereof to be determined by the court as herein provided. 2. *Simultaneously with the making of a motion for an order confirming the sale, provided such motion is made within ninety days after the date of the consummation of the sale by delivery of the proper deed of conveyance to the purchaser, the party to whom such residue shall be owing may make a motion in the action for leave to enter a deficiency judgment ....* Upon such motion the court ... shall determine ... the fair and reasonable market value of the mortgaged premises ... and shall make an order directing the entry of a deficiency judgment. Such deficiency judgment shall be for an amount equal to the sum of the amount owing by the party liable as deter-

One of the arguments that Emmes raised in its summary judgment response below was that, even if New York deficiency law applied, appellants had waived any defensive use of that law by their concessions in the agreed bankruptcy order.[10] Emmes again raises that argument in its appellee's brief. That agreed order provided in pertinent part that all four individual appellants "acknowledge validity of the judgment [against them as guarantors] entered in New York *and waive any defenses they have to its enforcement after December 3, 1999.*" (Emphasis added.) Neither in their opening briefs nor in their rehearing motions on appeal do appellants reply to the merits of Emmes's waiver-by-agreed-bankruptcy-order argument, and they likewise did not reply to the argument below.[11]

---

mined by the judgment with interest, plus the amount owing on all prior liens and encumbrances with interest, ... less the market value as determined by the court or the sale price of the property whichever shall be the higher.

3. *If no motion for a deficiency judgment shall be made as herein prescribed the proceeds of the sale shall regardless of amount be deemed to be in full satisfaction of the mortgage debt and no right to recover any deficiency in any action or proceeding shall exist.*

N.Y. REAL PROP. ACTS § 1371 (McKinney 1979) (emphasis added).

10. Emmes has never asserted that the agreed bankruptcy order in any way defeated any of appellants' challenges under Texas law.

11. In our original opinion, we concluded that Emmes had raised its waiver-by-agreed-bankruptcy-order argument in the second Texas suit in a supplemental motion for summary judgment, as well as in a summary judgment response. We reached this conclusion for several reasons. First, the record from the second Texas suit contained a document, filed January 31, 2001, styled Emmes's "Supplement to Motion for Summary Judgment." That supplement itself stated no grounds, but instead stated that it "attach[ed] and incorporate[d] by reference" Emmes's "response to the summary judgment motions filed in [the first Texas suit]." Despite this recitation, Emmes's summary judgment supplement in our record did not contain an attachment. The record of the second Texas suit *did*, however, contain Emmes's summary judgment response from the first Texas suit. In our original opinion, we thus assumed that the supplement's missing attachment was what it claimed to be: Emmes's summary judgment response from the first Texas suit. That response contained the waiver-by-agreed-bank-

ruptcy-order argument, which would have defeated any of appellants' New–York–law challenges and which appellants did not challenge on appeal. Accordingly, in our original opinion, we overruled all of appellants' New–York–law challenges without reaching their merits. *See Walling v. Metcalfe,* 863 S.W.2d 56, 58 (Tex.1993) (holding that appellate court cannot reverse judgment for reason not raised in point of error); *Fed'l Deposit Ins. Corp. v. Attayi,* 745 S.W.2d 939, 942 (Tex. App.-Houston [1st Dist.] 1988, no writ) (holding that, when order granting summary judgment does not state grounds, appellant must show that each of independent arguments alleged in summary judgment motion is insufficient to support judgment).

On rehearing, appellants claim (and have provided supporting documentation) that the attachment incorporated into Emmes's "Supplement to Motion for Summary Judgment" in the second Texas suit was *not* Emmes's summary judgment *response* from the first Texas suit, but was instead merely Emmes's supplemental *briefing*—also styled "Supplement to Motion for Summary Judgment" and filed on January 31, 2001—from the first Texas suit. (Appellants did not supplement our record with Emmes's January 31 briefing from the first Texas suit until rehearing.) Emmes does not deny that the attachment to its "Supplement to Motion for Summary Judgment" in the second suit was only its briefing from the first Texas suit, but merely states that "there appears to be some confusion in the record as to what documents were attached" and that the supplement nonetheless expressly referred to Emmes's summary judgment response from the other suit. Emmes is right about the confusion: *our record cannot confirm what appellants claim, but it does strongly imply that they are right.*

The agreed bankruptcy order was signed by the borrower, Emmes, and the four appellants. The order provided:

> If the foregoing provisions [relating to the borrower] are complied with in full, Emmes will forebear from pursuing collection activities under the judgment granted to Emmes against Richard Segal and Joseph Fogarty and their wives until December 3, 1999. The appeal filed by Mr. and Mrs. Segal and Mr. and Mrs. Fogarty in the New York action based on their guaranties on the Note, as well as the motion filed in Texas challenging the domestication of the judgment on the Note and the motion seeking to stay the enforcement of the judgment on the Note shall be withdrawn within 10 days after this Order is entered. *Mr. and Mrs. Fogarty and Mr. and Mrs. Segal acknowledge validity of the judgment entered in New York and waive any defenses they have to its enforcement after December 3, 1999.*

(Emphasis added.) The "judgment" to which the quoted provision refers is actually two judgments—those rendered in New York against the Segals and the Fogartys based on the guaranty.

> Appellants' guaranty, in turn, provided: This guaranty is and shall be construed to be an absolute, continuing, unconditional and unlimited guaranty of payment. [Emmes] shall have the right to proceed against [appellants] or any one of them immediately upon any default hereunder and shall not be required to take any action or proceeding of any kind against the Borrower or any other party liable for the Borrower's debts or any security which [Emmes] may hold, either under this guaranty, or otherwise, before proceeding against [appellants] or any one of them hereunder and [Emmes] shall have the right to proceed against all or any portion of any collateral held by [Emmes] as security for any debt of Borrower or under thus guaranty and in such order or manner as [Emmes], in its sole discretion, shall determine. . . .

In the agreed bankruptcy order, appellants expressly acknowledged the validity of the judgments rendered against them based upon the unconditional guaranty quoted above, and they waived "any defenses" that they had to the judgments' enforcement. The question is whether appellants' acknowledgment and waiver in the agreed bankruptcy order precluded them from using New York deficiency law as a bar to Emmes's enforcing a deficiency judgment against them as guarantors. Because the agreed bankruptcy order waived "any defenses" to the guaranty's enforcement, we must determine whether the New York deficiency law's bar falls within the meaning of "any defense." We conclude that it does.

New York deficiency law places the burden on the creditor to seek a deficiency

---

What Emmes actually incorporated into its summary judgment supplement in the second Texas suit is important because Emmes did not raise the waiver-by-agreed-bankruptcy-order argument in its January 31 briefing (and, in any event, arguments asserted in mere briefing cannot be considered summary judgment grounds, *see McConnell*, 858 S.W.2d at 341), but only in its summary judgment response in the first Texas suit. For purposes of this opinion, and because the record implies that the supplement's attachment was mere briefing, we treat the waiver-by-agreed-bankruptcy-order argument as having been raised only as a response, not as a summary judgment ground. However, we note that, if the waiver-by-agreed-bankruptcy-order argument *was* a true summary judgment ground, we would still overrule appellants New-York-law challenges because appellants did not assign error to that ground. *See Walling*, 863 S.W.2d at 58; *Attayi*, 745 S.W.2d at 942.

judgment within 90 days after the foreclosure sale on mortgaged property; if the creditor does not do so, it is barred from seeking a deficiency judgment at all. N.Y. REAL PROP. ACTS § 1371(3). The New York courts have likened the section 1371(3) bar to a statute of limitations, which must be timely raised by the debtor as a defense when the creditor seeks a deficiency. *See Bianco v. Coles*, 131 A.D.2d 10, 520 N.Y.S.2d 261, 262 (1987); *Voss v. Multifilm Corp. of Am.*, 112 A.D.2d 216, 491 N.Y.S.2d 434, 435 (1985); *Amsterdam Sav. Bank v. Amsterdam Pharmaceutical Dev. Corp.*, 106 A.D.2d 797, 484 N.Y.S.2d 217, 218 (1984); *Mortgagee Affiliates, Inc. v. Jerder Realty Corp.*, 62 A.D.2d 591, 406 N.Y.S.2d 326, 327 (1978), *aff'd*, 47 N.Y.2d 796, 417 N.Y.S.2d 930, 391 N.E.2d 1011 (1979). Section 1371(3) is thus a procedural defense, not a jurisdictional bar, contrary to the Segals' implication in their opening brief. *See Voss*, 491 N.Y.S.2d at 435; *Mortgagee Affiliates, Inc.*, 406 N.Y.S.2d at 327. Appellants' use of the section 1371(3) bar is thus defensive, even when asserted in a Texas deficiency proceeding by those designated as plaintiffs. Therefore, we hold that, even if New York deficiency law applied, appellants waived any use of that law's section 1371(3) defensive bar by entering into the agreed bankruptcy order.[12] We thus further hold that

the trial court did not err in rejecting the defensive New–York–deficiency–law grounds in appellants' summary judgment motions and in determining that appellants' arguments based on those same grounds did not preclude summary judgment for Emmes.[13]

We overrule the Fogartys' first issue and the Segals' first and second issues.

**B. Appellants' Challenges to Their Contractual Waiver of Rights Under Texas Deficiency Law**

The guaranty, signed by each appellant as guarantor, contained the following waiver, which is italicized:

14. The [Segals and Fogartys] *hereby releases, discharges and acquits forever [Emmes] and its officers, directors, trustees, agents, employees and counsel (in each case, past, present or future) from any and all Claims existing as of the date hereof (or the date of actual execution hereof) by [the Segals and Fogartys], if later. As used herein, the term "Claim" shall mean any and all liabilities, claims, defenses, demands, actions, causes of action, judgments, deficiencies, interest, liens, costs or expenses ... of any kind and character whatsoever, ... in each case whether now known or unknown, suspected or*

---

12. Because appellants never replied to Emmes's waiver-by-agreed-bankruptcy-order argument in the record below, and because they do not address the merits of that argument in any brief on appeal, we cannot find any place (record or brief) in which appellants have attacked the validity of the waiver contained within the agreed bankruptcy order, as opposed to waivers within the underlying transactional documents. Moreover, the Segals' own summary judgment response contained an argument—not reasserted by issue on appeal—that the guaranty (specifically, its waiver of the right to valuation and offset under Texas law) was superseded or modified by the agreed bankruptcy order's terms, thus not

only implying that the agreed bankruptcy order was valid, but also relying on the order themselves. We also note that appellants did not enter into the waiver of their New–York–deficiency–law defensive rights as part of their original guaranty contract, but did so only after Emmes had obtained judgments against them based on the guaranty and in exchange for Emmes's forbearance in enforcing the guaranty judgments, which Emmes could then have enforced under the unconditional guaranty's terms.

13. Accordingly, we need not reach whether New York or Texas deficiency law applied.

unsuspected, asserted or unasserted or primary or contingent, and whether arising out of written documents, unwritten undertakings, course of conduct, tort, violations of laws or regulations or otherwise. *To the maximum extent permitted by applicable law, [appellants] hereby waive[s] all rights, remedies, claims and defenses based upon or related to Sections 51.003, 51.004 and 51.005 of the Texas Property Code, to the extent the same pertain or may pertain to any enforcement of this Guaranty.*

(Italics added; underlining in original.) [14] Property Code Section 51.005 allows a guarantor to challenge the fair-market value of property sold in a non-judicial foreclosure sale as a prelude to seeking an offset from the deficiency amount. *See* TEX. PROP.CODE ANN. § 51.005(b), (c) (Vernon 1995).[15] It is under section 51.005— the rights of which appellants' expressly waived in the guaranty—that appellants sued and counterclaimed against Emmes in both Texas suits.

14. The deed of trust contained a parallel waiver, but that document was signed by the borrower, not by appellants:

To the maximum extent permitted by applicable law, [the borrower] hereby waives all rights, remedies, claims and defenses based upon or related to *Sections 51.003, 51.004 and 51.005* of the Texas Property Code, to the extent the same pertain or may pertain to any enforcement of this Deed of Trust. (Emphasis in original.)

15. (b) The guarantor may bring an action in the district court in the county in which the real property is located for a determination of the fair market value of the real property as of the date of the foreclosure sale. The suit must be brought not later than the 90th day after the date of the foreclosure sale or the date the guarantor receives actual notice of the foreclosure sale, whichever is later. The fair market value shall be determined by the finder of fact....

By separate issues, appellants claim that the section 51.005 waiver in the guaranty was either unenforceable or void for various reasons or that material fact issues precluded summary judgment.

## 1. Public Policy

In their fifth issue, the Segals claim that the guaranty's waiver is void for violating Texas public policy. In part of their third issue, the Fogartys claim that the guaranty's waiver (and the deed of trust's parallel waiver) is unenforceable for violating Texas public policy.

Property Code section 51.005(b)'s purpose is to prevent mortgagees from recovering more than their due at the guarantor's expense. *See Long v. NCNB–Texas Nat'l Bank,* 882 S.W.2d 861, 865 (Tex.App.-Corpus Christi 1994, no writ) (noting that section 51.005 was designed to protect guarantors in deficiency suits arising out of non-judicial foreclosures on realty). That purpose does not necessarily translate into a policy so fundamental to Texas jurisprudence that it cannot be waived contractually. Appellants cite no case so holding.[16]

(c) If the finder of fact determines that the fair market value is greater than the sale price of the real property at the foreclosure sale, the persons obligated on the indebtedness, including guarantors, are entitled to an offset against the deficiency in the amount by which the fair market value, less the amount of any claim, indebtedness, or obligation of any kind that is secured by a lien or encumbrance on the real property that was not extinguished by the foreclosure, exceeds the sale price. If no competent evidence of fair market value is introduced, the sale price at the foreclosure sale shall be used to compute the deficiency. TEX. PROP.CODE ANN. § 51.005(b), (c) (Vernon 1995).

16. Appellants rely on *Lester v. First American Bank, Bryan, Texas,* but that case does not support them. *See id.,* 866 S.W.2d 361 (Tex. App.-Waco 1993, writ denied). The *Lester* court indicated that the purpose of statutes

Another section of Property Code chapter 51 implies that appellants are incorrect. In 1987, the Legislature amended Property Code section 51.002 to add subsection (d):

> *Notwithstanding any agreement to the contrary,* the holder of the debt shall serve a debtor in default under a deed of trust or other contract lien on real property used as the debtor's residence with written notice by certified mail stating that the debtor is in default under the deed of trust or contract. The debtor must be given at least 21 days to cure the default before the entire debt is due and notice of sale is given.

Act of May 19, 1987, 70th Leg., R.S., ch. 540, § 1, 1987 Tex. Gen. Laws 2174, 2174 (appearing at Tex. Prop.Code Ann. § 51.002(d) (Vernon 1995)) (emphasis added), *amended by* Act of April 15, 1993, 73rd Leg., R.S., ch. 48, § 5, 1993 Tex. Gen. Laws 97, 99. The accompanying bill analysis indicates that the Legislature added subsection (d) to clarify that a residential debtor's right to notice and to cure could not be waived by agreement. House Comm. on Bus. & Comm., Bill Analysis, Tex. H.B. 1504, 70th Leg., R.S. (1987). The Legislature thus knew how to grant a non-waivable right in chapter 51, but chose not to do so in sections 51.003 or 51.005, the provisions granting valuation and offset rights to debtors and guarantors. The omission of such language in section 51.005 thus implies that the rights that it confers are not so fundamental that they cannot be waived.

Likewise, provisions of the Texas Property Code outside chapter 51 imply that section 51.005's valuation and offset rights can be waived contractually. In at least 11 other instances within the Property Code, the Legislature has expressly stated that waivers of given rights, obligations, liabilities, exemptions, etc. are void or voidable, either categorically or under certain conditions.[17] That prohibitive language appears nowhere in sections 51.003 or 51.005. This omission indicates strongly that the Legislature did not find the protections afforded in section 51.005 to be so fundamental that they could not be waived contractually. *See LaSalle Bank Nat'l Ass'n v. Sleutel,* 289 F.3d 837, 841–42 (5th Cir.2002) (applying same reasoning to hold that guarantor could validly waive any offset rights under Texas Property Code section 51.003).

Furthermore, this Court's decision in *Chase Manhattan Bank, N.A. v. Greenbriar North Section II* provides analogous support for our conclusion. *See id.,* 835 S.W.2d 720 (Tex.App.-Houston [1st Dist.] 1992, no writ). In *Chase Manhattan,* we recognized that the New York and Texas

---

like section 51.005 was to safeguard mortgagors. *See id.* at 367. However, the court did not hold that that purpose represented a policy so fundamental that the statute's rights could not be waived contractually. *See id.*

**17.** *See* Tex. Prop.Code Ann. § 28.006(a) (Vernon 2000) (concerning payment to contractors and subcontractors); *id.* § 54.043(b) (Vernon 1995) (concerning residential landlord's lien); *id.* § 62.022(a) (Vernon Supp. 2004) (concerning broker's lien on commercial real estate); *id.* § 70.410 (Vernon Supp. 2004) (concerning agricultural liens); *id.* § 91.006(b) (Vernon Supp.2004) (concerning landlord's duty to mitigate damages); *id.* § 92.008(g) (Vernon 1995) (concerning interruption of utilities in residential tenancies); *id.* § 92.0081(j) (Vernon 1995) (concerning removal of property and exclusion of residential tenant); *id.* § 94.003 (Vernon Supp.2004) (concerning manufactured-home tenancies); *id.* § 94.202(b) (Vernon Supp.2004) (concerning landlord's duty to mitigate damages upon termination, eviction, or foreclosure in manufactured-home tenancies); *id.* § 221.041(c) (Vernon 1995) (concerning purchaser's right to cancel timeshare-purchase contract); *id.* § 222.008(a) (Vernon 1995) (concerning purchaser's right to cancel membership-camping contract).

deficiency laws were materially different and that New York's requirement that a creditor confirm a sale within 90 days was "not merely 'procedural,' " but was instead an integral part of the creditor's deficiency claim. *Id.* at 726–27. The application of New York deficiency law would have deprived the creditor in *Chase Manhattan* of any deficiency rights. *Id.* Nonetheless, as part of a choice-of-law analysis, we held that "no 'fundamental policy' of Texas" was implicated or offended by applying the materially different New York deficiency law that would, or could, effectively result in the creditor's total loss of any deficiency rights. *Id.* If it did not offend the fundamental policy of Texas to apply a foreign law, as the parties had contracted to do, that would effectively destroy one party's deficiency rights because that party had not complied with that law, then, by analogy, it does not offend the fundamental policy of Texas for a party knowingly to waive its right to challenge the foreclosure sale price in a deficiency suit. *Cf. id.*

We distinguish *SBKC Service Corp. v. 1111 Prospect Partners,* on which the Segals appear to rely for the proposition that a debtor cannot prospectively waive his deficiency-related rights.[18] *See id.,* 153 F.3d 728, 1998 WL 436579 (10th Cir. July 30, 1998) (not designated for publication). First, the *SBKC Service* court's holding did not concern whether a debtor could prospectively waive these rights, but instead concerned whether California or Kansas law applied to the deficiency suit. *See id.* at * 6. It was only in dictum that the court noted that California's anti-deficiency statute barred such a prospective waiver. *See id.* at * 4. Second, the California anti-deficiency statute considered in *SBKC Service* differs materially from the deficiency statute of Texas: the California statute bars deficiency judgments entirely after a non-judicial foreclosure sale,[19] whereas the Texas statute allows a creditor to seek a deficiency judgment after a non-judicial foreclosure sale, subject to the debtor's or guarantor's right to seek a valuation of the property and an offset.[20] This statutory difference prevents *SBKC Service's* dictum from applying here. *See LaSalle Bank Nat'l Ass'n,* 289 F.3d at 841 (in holding that Texas law allowed guarantor contractually to waive right to offset from deficiency judgment, finding important the fact that Texas's deficiency statutes do not preclude deficiency judgments after non-judicial foreclosure sales, but instead allow liable party to seek offset; noting that other states' anti-deficiency statutes, in contrast, precluded deficiency judgments altogether after non-judicial foreclosure sales).

. By separate argument under another issue in their brief,[21] the Segals claim that contractual clauses waiving procedural or substantive rights must limit the waiver to a reasonable time. The Segals assert that the guaranty's valuation-and-offset waiver is such a clause and that it fails this requirement. The Segals rely on *Duncan v. Lisenby* for this proposition, but that opinion does not support them. *Duncan* con-

---

**18.** The Segals discuss *SBKC Service* under their fourth issue (ambiguity and conspicuousness), although the opinion arguably concerns the public-policy points raised in the Segals' fifth issue.

**19.** *See* CAL.CODE CIV. P. § 580d (West 2004) (barring entirely any deficiency upon note secured by deed of trust or mortgage upon real property if creditor has already sold the prop-

erty under power of sale contained in deed of trust or mortgage).

**20.** *See* TEX. PROP.CODE ANN. §§ 51.003, 51.005.

**21.** This argument also appears under the Segals' fourth issue, although the argument concerns whether the guaranty's waiver violates public policy.

cerned only a prospective agreement to waive the defense of limitations: "A general agreement in advance to waive or not to plead the statute of limitations on a particular obligation is void as against public policy. The agreement must be specific and for a predetermined length of time." *Id.*, 912 S.W.2d 857, 858–59 (Tex.App.-Houston [14th Dist.] 1995, no writ). *Duncan* did not concern the waiver of a substantive right, but the waiver of a procedural bar.

This is an important distinction. A limitations bar differs materially from a debtor's or guarantor's rights to valuation and offset under chapter 51. Limitations is the Legislature's procedural device for establishing a point of repose for past actions and for "ensur[ing] that the search for truth is not impaired by stale evidence or the loss of evidence." *Childs v. Haussecker*, 974 S.W.2d 31, 38–39 (Tex.1998); *accord Stewart Title Guar. Co. v. Hadnot*, 101 S.W.3d 642, 644 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). Because one waiving a limitations bar is effectively expanding the time that the Legislature has allowed for suit, it is logical to require the waiving party to confine that waiver to a reasonable amount of time, rather than to waive the bar altogether. In contrast, a guarantor's valuation and offset rights under chapter 51 are substantive rights, not procedural bars to suit. Those substantive rights do not spring into existence until the creditor seeks a deficiency judgment—an event necessarily occurring after the guarantor waives those rights in the underlying guaranty contract. There is thus no continuing period, such as the time in which to file suit, that the guarantor is extending by its contractual waiver. Accordingly, *Duncan's* holding does not apply.

We overrule the Segals' fifth issue and this part of the Fogartys' third issue.

## 2. Waiver of a Right Not Yet in Existence

■ In the remainder of their third issue, the Fogartys claim that the guaranty's waiver (and the deed of trust's parallel waiver) is unenforceable because the right waived—the right to seek a fair-market-value determination—did not exist when the waiver was signed.

■ The cases on which the Fogartys rely are distinguishable because they generally concern waiver by action or inaction, *i.e.*, implied waiver, not express or contractual waiver. *See Cent. Am. Life Ins. Co. v. Krause*, 284 S.W.2d 192, 193–94 (Tex.Civ. App.-Amarillo 1955, no writ) (considering whether insurer, by drawing premium, waived forfeiture of policy); *Faubian v. Busch*, 240 S.W.2d 361, 365–66 (Tex.Civ. App.-Amarillo 1951, writ ref'd n.r.e.) (considering waiver of right to enforce deed restrictions by action or inaction). To waive a right impliedly, by acting inconsistently with it or by not acting at all, the right must be assertable at the time that the right is waived. Not so with a right expressly and knowingly waived by contract. Unless a statute or fundamental public policy precludes waiver (and we have held that it does not), one may generally waive even constitutional or statutory rights, present or future, by contract. *See Williams v. Williams*, 569 S.W.2d 867, 869–70 (Tex.1978) (holding that surviving spouse could contractually waive statutory and constitutional homestead rights); *Dillee v. Sisters of Charity of Incarnate Word Health Care Sys.*, 912 S.W.2d 307, 308–09, 311 (Tex.App.-Houston [14th Dist.] 1995, no writ) (holding that employee could contractually waive contract and constitutional right to due process and hearing upon termination of employment); *Beago v. Ceres*, 619 S.W.2d 293, 295 (Tex.Civ.App.-Houston [1st Dist.] 1981, no writ) (noting that joint owner may contractually waive

absolute, statutory right to partition real property).

We overrule the remainder of the Fogartys' third issue.[22]

### 3. Ambiguity and Conspicuousness

In their fourth issue, the Segals claim that the guaranty's waiver (and the deed of trust's parallel waiver) was unenforceable for being ambiguous and inconspicuous.

#### a. Ambiguity

 A court's primary duty in construing a contract is to ascertain the drafter's intent from the instrument's language. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983). In ascertaining the drafter's intent, we must examine the contract as a whole and strive to give every part of the contract effect. *Id.; Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex.1994).

 Whether a contract is ambiguous is a matter of law for the court to decide. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex.1996). A contract is unambiguous if, after appropriate rules of construction have been applied, the contract can be given a definite or certain legal meaning. *See id.; Pitman v. Lightfoot,* 937 S.W.2d 496, 517 (Tex.App.-San Antonio 1996, writ denied). In contrast, if, after appropriate rules of construction have been applied, a contract is susceptible of more than one reasonable interpretation, the contract is ambiguous. *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 157 (1951). Mere disagreement over a contract's interpretation does not necessarily render the contract ambiguous. *Columbia Gas,* 940 S.W.2d at 589.

 The Segals argue that the guaranty's paragraph 14, which contains both a release and the waiver provision on which Emmes relies, is ambiguous when read in its entirety. Specifically, the Segals claim that an earlier recitation in paragraph 14—that appellants released Emmes from claims "existing as of the date [of the guaranty]"—rendered ambiguous the paragraph's later waiver of appellant's Property Code rights, which waiver did not specify when the waived rights accrued. We disagree.

Paragraph 14 was clearly divided into two parts. The first part (two sentences) of paragraph 14 released Emmes from claims that existed as of the date of the guaranty's signing:

> [Appellants] hereby releases, discharges and acquits forever [Emmes] and its officers, directors, trustees, agents, employees and counsel ... from any and all Claims existing as of the date hereof (or the date of actual execution hereof by [appellants], if later)....

Those two initial sentences functioned as a backwards-looking release from previously or simultaneously incurred liability.

In contrast, the second part (one sentence) of paragraph 14 was necessarily a waiver of future rights and defenses because that sentence waived only those rights and defenses that "pertain[ed]" or may pertain to any enforcement of this Guaranty":

> To the maximum extent permitted by applicable law, [appellants] · hereby waives all rights, remedies, claims and defenses based upon or related to *Sections 51.003, 5.004* and *51.005* of the Texas Property Code, to the extent the

---

22. To the extent that the Segals' brief contains argument, under their fourth issue's "ambiguity" challenge, that they could not waive a right that did not yet exist, we over-rule that argument for the reasons that we have overruled the same argument under the Fogartys' third issue.

same pertain or may pertain to any enforcement of this Guaranty.

The enforcement of a guaranty necessarily post-dates the making of the guaranty because enforcement comes only after the borrower's default on the note that the guaranty supports. The parties thus clearly intended paragraph 14's "waiver" section to be separate from its "release" section and for the paragraph's two sections to concern claims or defenses arising at different points in time. There was thus no ambiguity in paragraph 14, and the trial court did not err in implicitly determining as much.

We overrule this portion of the Segals' fourth issue.

### b. Conspicuousness

■■■ In the remainder of their fourth issue, the Segals argue that the waiver in paragraph 14 of the guaranty is unenforceable because it was not conspicuous.

The Segals cite no authority holding that a waiver such as this must be conspicuous. Rather, they rely on a line of authority holding that indemnity agreements and agreements to release another in advance from liability for the other's negligence must be conspicuous. *See Littlefield v. Schaefer,* 955 S.W.2d 272, 273 (Tex.1997).[23] We have serious doubts about whether this line of authority applies here, however.

■■■ The waiver in paragraph 14 is not a release of liability for Emmes's future negligence. A release of future liability is a contractual arrangement in which one party assumes the liability inherent in a situation and thereby surrenders legal rights or obligations. *See Dresser Indus., Inc. v. Page Petroleum, Inc.,* 853 S.W.2d 505, 508 (Tex.1993). Such a release thus

operates to extinguish a claim or defense as effectively as would a prior judgment and is an absolute bar to any right of action on the released matter. *Id.* Although most contractual provisions operate to transfer risk, a contractual release that frees a party in advance from liability for its own negligence represents an "extraordinary shifting of risk," so much so that the risk-shifting provision must be conspicuous, among other things. *See id.*

By paragraph 14's waiver, the Segals surrendered the right to a fair-market-value determination and an offset if Emmes sought a deficiency judgment. The Segals claim that, by barring their assertion of these rights, the waiver effectively shifted to them "the risk of loss attributable to real estate market nuances." However, the shifting of that risk is not necessarily so extraordinary that the waiver had to be conspicuous. Most contractual provisions shift risk, but only those provisions that represent an extraordinary shifting of risk must be conspicuous. *See id.* Moreover, the waiver does not expressly release Emmes from *its* future acts, and the reasons for which Emmes might seek a deficiency judgment are not necessarily limited to Emmes's conduct in holding the sale, *i.e.,* the reasons could include a poor market or low bidding on the day of sale, for example. We thus find this waiver sufficiently different from those considered in the line of authority on which the Segals rely that we are not convinced of the application of the Segals' authority. *Compare Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 387 (Tex.1997) (holding that clause providing that contractor would not be liable to subcontractor for delay in subcontractor's work caused by anyone, including contractor—which clause thus effectively made

---

**23.** The Segals also rely on *Derr Construction Company v. City of Houston,* but that court did not discuss the conspicuousness requirement. *See id.,* 846 S.W.2d 854 (Tex.App.-Houston [14th Dist.] 1992, no writ).

subcontractor bear risk of untimely completion, even if contractor caused delay—was not type of extraordinary risk-shifting clause subject to conspicuousness requirement) *with Dresser,* 853 S.W.2d at 507 (applying conspicuousness requirement to release and hold-harmless agreement) *and Lawrence v. CDB Servs., Inc.,* 44 S.W.3d 544, 553–54 (Tex.2001) (applying conspicuousness requirement to employee's written waiver of right to sue for injury, illness, or death arising at work due to employer's negligence or "actionable conduct").

But even if the conspicuousness requirement applied to this type of waiver, we would hold that paragraph 14's waiver was sufficiently conspicuous. Whether a release is conspicuous is a question of law. *Dresser,* 853 S.W.2d at 509. For a release to be conspicuous, something must appear on the contract's face to attract the attention of a reasonable person against whom it is to operate. *Id.* at 508, 511. "For example, language in capital headings, language in contrasting type or color, and language in an extremely short document, such as a telegram, is conspicuous." *Id.* at 511.

Paragraph 14 contained only two provisions: (1) a release of past liability (first two sentences)[24] and (2) the waiver attacked in this appeal (last sentence). The paragraph was the final contractual provision and appeared immediately above the signature lines. Most importantly, however-

er, the Property Code sections that were being waived were underlined, a significant fact that the Segals fail to mention in their brief. Under these circumstances, the trial court would not have erred if it concluded that a reasonable person's attention would have been drawn to this waiver.[25] We thus hold that, if the conspicuousness requirement applied, it was met.

We overrule the remainder of the Segals' fourth issue.

### 4. Fair-market value

In their third issue, the Segals argue that genuine issues of material fact about the three properties' fair-market values precluded summary judgment for Emmes.[26]

We have already held that the guaranty's waiver clause is not invalid or unenforceable for the reasons that the Segals have argued. Because the Segals validly waived their rights to seek a fair-market-value determination and an offset, it is immaterial whether the Segals raised a fact issue on the three properties' fair-market value.

We thus overrule the Segals' third issue.

### IV. Appellants' Challenges to the Non–Judicial Foreclosure Procedure Used by the Trustee[27]

The first property ("tract 1") encumbered under the deed of trust is locat-

---

24. The Segals do not complain of the release from past liability.

25. We distinguish the authority on which the Segals rely because, in that case, the release was in far smaller print than that of rest of contract and was practically illegible. *See Littlefield v. Schaefer,* 955 S.W.2d 272, 275 (Tex.1997).

26. The Segals did not separately assert this argument in their summary judgment motions or responses in either suit. However,

this argument may be raised for the first time on appeal because it concerns whether Emmes, as movant, proved its entitlement to summary judgment as a matter of law. *See McConnell,* 858 S.W.2d at 343 (holding that non-movant who does not respond to motion may nonetheless argue on appeal that motion's grounds were legally insufficient). Accordingly, we address the Segals' issue three.

27. We note that no instrument signed by appellants expressly waived their rights under Texas Property Code section 51.002, the pro-

ed in Harris County. The second property ("tract 2") is located in Polk County. The third property, consisting of two separate pieces of land, is located in Harris County ("tract 3a") and in Montgomery County ("tract 3b"). None of the specifically described properties overlapped into an adjoining county. It is undisputed that the trustee posted notices in the properties' three respective counties that the sales would take place in Harris County.[28] It is further undisputed that the trustee conducted the sales of all properties solely at the Harris County courthouse.

In their sixth issue and on rehearing, the Segals claim that the trial court erred in granting Emmes's motion for summary judgment, and in denying their own motion for summary judgment, because the foreclosure sales of tracts 2 and 3b were either void or voidable for having been held in Harris County, rather than in the counties in which those two tracts were located. The Segals claim that the sales' location "chilled" the bidding process for tracts 2 and 3b, resulting in what they allege was an inadequate sale price for the two tracts. The Fogartys raise similar challenges in their second issue and on rehearing, although they claim that the sales of tracts 2 and 3b were void. All parties agree that Texas law applied to the foreclosure sales.[29]

## A. The Parties' Interpretations of the Texas Foreclosure Statute

The controlling statute reads as follows:

A sale of *real property* under a power of sale conferred by a deed of trust or other contract lien ... must take place at the county courthouse in the county in which *the land* is located, or if *the property* is located in more than one county, the sale may be made at the courthouse in any county in which *the property* is located.

TEX. PROP.CODE ANN. § 51.002(a) (Vernon 1995) (emphasis added). Section 6.4 of the deed of trust contained a similar requirement.[30]

Appellants construe the statute's "the land" and "the property" to mean only one piece of property, regardless of how many pieces of property the deed of trust covers. Under their construction, the trustee may select in which of multiple counties to sell a single piece of property held under a deed of trust only when that one piece of property lies in more than one county, *i.e.*, only if the same piece of property crosses the boundary between or among counties. If, however, the deed of trust covers several, non-contiguous pieces of property, each of which lies in only one county, and none of which lies in the same county, then the trustee must sell each piece of property in the county in which it lies. The trustee's

---

cedural foreclosure statute at issue in this section IV.

28. No one claims that these notices were deficient, other than that they called for sale solely in Harris County.

29. Moreover, the deed of trust provided that New York law applied "except to the extent of procedural and substantive matters relating only to the creation, perfection and foreclosure of liens, *and enforcement of rights and remedies against the mortgaged property,* which matters shall be governed by the laws of the state of Texas." (Emphasis added.)

30. The Property Code allows the sale of subject property that is located in more than one county to be held in any county in which the property is located. *See* TEX. PROP.CODE ANN. § 51.002(a) (Vernon 1995). The deed of trust provided more specifically that, if the subject property was located in more than one county, "the sale *will* be made at the courthouse in *one* of those counties." (Emphasis added.) However, no party has ever argued that this difference between the deed of trust and the statute is material to this case.

foreclosure sale did not comply with appellants' interpretation of the statute.

In contrast, Emmes construes the statute's "the land" and "the property" to mean all property covered by the same deed of trust. Under Emmes's construction, if the deed of trust covers several, non-contiguous pieces of property, each of which lies in only one county, and none of which lies in the same county, the trustee may sell all pieces of property in any of the counties in which any piece of property lies. The trustee's foreclosure sale complied with Emmes's interpretation of the statute.

## B. Discussion

Statutory interpretation is a question of law. *In re Canales*, 52 S.W.3d 698, 701 (Tex.2001). Our primary goal in interpreting a statute is to ascertain and to effectuate the Legislature's intent. *Id.* In doing so, we begin with the statute's plain language before resorting to rules of construction. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex.2001); *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 865–66 (Tex.1999). We begin with the plain language because we assume that the Legislature tried to say what it meant; therefore, the statute's words should be the surest guide to the Legislature's intent. *Fitzgerald*, 996 S.W.2d at 866. In ascertaining legislative intent, we do not confine our review to isolated statutory words, phrases, or clauses, but we instead examine the entire act. *Meritor Auto., Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86, 90 (Tex.2001); *see* TEX. GOV'T CODE ANN. § 311.011 (Vernon 1998) (instructing courts to construe words and phrases in context).

### 1. The Plain Language of Property Code Section 51.002(a) is Ambiguous

In interpreting section 51.002(a), we start with its plain language. *See Wilkins*, 47 S.W.3d at 493. Only if we find that section 51.002(a)'s plain language is susceptible of two or more reasonable interpretations will we hold that the statute is ambiguous. *See In re Mo. Pac. R.R. Co.*, 998 S.W.2d 212, 217 (Tex.1999).

Supporting Emmes's interpretation is the following logic based on the statute's plain language:

- The words "real property," "land," and "property" can be synonyms.[31]
- Accordingly, the use of the definite article "the" before "land" and "property" means simply that those two terms refer back to the earlier, synonymous term "real property" in the statute's initial phrase.
- The context of "real property" in the initial phrase indicates that "real property" can represent one or multiple tracts, as long as all are encumbered under one deed of trust.
- Therefore, the term "the property," as with the earlier, synonymous term "real property," can mean any number of tracts—even non-contiguous tracts lying in different counties—together comprising the "real property" encumbered under the deed of trust.

Supporting appellants' interpretation is the following logic based on the statute's plain language:

- The context of "real property" in the initial phrase indicates that "real property" can represent one or multiple tracts.
- Similarly, "land" can represent one or multiple tracts.[32]

---

31. *See* RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 1079, 1550, 1607 (2nd ed.1987).

32. *See* RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 1079 (2nd ed.1987) (not distin-

- "Property," however, is a singular noun, and its plural is "properties." [33]
- Section 51.002(a) uses only the singular form "property," the singularness of which is emphasized by the use of the definite article "the."
- Therefore, the use of "the property" is not simply referring back to any and all tracts encumbered under a deed of trust and subsumed by the earlier terms "real property" and "land," but instead means only one tract that crosses county lines.

The remainder of section 51.002 does not greatly clarify section 51.002(a)'s language, although the use of "the sale" throughout the section seems to recognize that only one sale need take place for each deed of trust, regardless of the number or location of tracts of land encumbered under it (Emmes's interpretation). *See* TEX. GOV'T CODE ANN. § 311.011. Neither does the remainder of Property Code chapter 51 shed light on which party's construction of the statute is correct.

We hold that section 51.002(a)'s plain language can reasonably support either party's interpretation. Accordingly, we hold that the statute's plain language is ambiguous. *See In re Mo. Pac. R.R. Co.,* 998 S.W.2d at 217.

**2. The Code Construction Act's Factors Do Not Resolve the Ambiguity**

The Code Construction Act lists factors that a court may consider in construing a statute, whether or not the statute is ambiguous on its face. TEX. GOV'T CODE ANN.

§ 311.023 (Vernon 1998). When construing a statute, we may consider, among other things, (1) the statute's objectives; (2) the circumstances under which the statute was enacted; (3) the statute's legislative history; (4) common law, former law, and similar provisions; (5) the consequences of the statutory construction; (6) administrative agencies' construction of the statute; and (7) the title, preamble, and any emergency provisions. *Id.* at § 311.023(1)-(7); *Canales,* 52 S.W.3d at 702. We presume that the Legislature intended a just and reasonable result and favored public over private interests. TEX. GOV'T CODE ANN. § 311.021(3), (5) (Vernon 1998); *Wilkins,* 47 S.W.3d at 493. None of the above construction aids resolves the ambiguity of section 51.002(a)'s plain language.

**a. Section 51.002(a)'s objectives and the consequences of the parties' constructions**

The Texas Supreme Court has recognized that the evil that the Legislature sought to remedy by enacting the original 1889 statute [34] was oppressive and unfair foreclosure provisions, including those allowing sales in counties other than those in which the land lay because of the potential chilling effect on bidding, in private deed or lien contracts. *See Wylie v. Hays,* 114 Tex. 46, 263 S.W. 563, 566–67 (1924) (recognizing same in holding that statute did not unconstitutionally impair contracts because statute was reasonable exercise of power to protect public welfare); [35] *see*

guishing between plural and singular meaning of term).

**33.** *See* RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 1550 (2nd ed.1987).

**34.** Act approved March 21, 1889, 21st Leg., R.S., ch. 118 § 1, 1889 Tex. Gen. Laws 143, 143, *reprinted in* 9 H.P.N. Gammel, The Laws

of Texas 1822–1897, at 1171, 1171 (Austin, Gammel Book Co. 1898) (amended 1895) (current version at TEX. PROP.CODE ANN. § 51.002(a) (Vernon 1995)).

**35.** The Texas Supreme Court reasoned as follows:

In the light of what has been observed, it is thought that the provision of the Texas stat-

*also* Tex. Gov't Code Ann. § 311.023(1) (allowing court to consider statute's objective). Although the statutory purposes recognized in *Wylie* support appellants' interpretation, the *Wylie* Court was not considering situations in which the land encumbered under a deed of trust lay in more than one county. *Id.*, 263 S.W. at 564; *see Bateman v. Carter–Jones Drilling Co.*, 290 S.W.2d 366, 370 (Tex.Civ. App.-Texarkana 1956, writ ref'd n.r.e.) (holding that *Wylie* did not apply to foreclosure sale, under deed of trust, of non-contiguous tracts of land located in different counties).

In fact, there are beneficial and detrimental consequences to both parties' interpretations. *See* Tex. Gov't Code Ann. § 311.023(5) (allowing court to consider consequences of particular construction). On the one hand, Emmes's interpretation would facilitate and perhaps lessen the costs of foreclosure sales in an age when great distances are easily traversed,[36] and when sophisticated parties (as here) encumber several non-contiguous tracts of land under a single deed of trust, but would still give notice of the sale's location in each county involved. On the other

hand, as the Segals argue, appellants' interpretation might ensure no chilling effect on bidding from selling a tract of land somewhere potentially far away. Accordingly, we cannot say that considering these consequences necessarily clarifies the ambiguity.

The Segals also urge for the first time on rehearing that Emmes's interpretation of the statute, which would allow the trustee to choose in which county to sell the encumbered property under the circumstances present here, would necessarily require the trustee to breach its duties of impartiality and fairness by requiring the trustee to promote either the debtor's or the creditor's interests, depending on where the property is sold. We disagree. The choice of sale location is not necessarily a zero-sum game, with a clear winner and loser, for the reasons that we have discussed above. We also note that the deed of trust here made the borrower (and thus appellants) liable for all costs incurred upon default. When this type of contractual provision exists, the trustee's holding the sale of non-contiguous pieces of property encumbered under one deed of trust in one county, rather than in several

ute, which makes it necessary for the sale in this state to take place in the county where the land lies, being the one in question in this case, is calculated to be a wise regulation and one that is for the public welfare. The size and extent of the state of Texas furnish so wide a range as to place of sale that, if the matter be left without regulation, provisions can be readily made in any mortgage or deed of trust that will render the preservation of the mortgagor's rights at a sale extremely inconvenient, if not impossible, and that, because of the remoteness and inaccessibility of the land and of the records of title to the property, are calculated to destroy bidding, in that strangers to the land and its possession and title will not ordinarily be willing to purchase. Moreover, the provision in this statute as to the place of sale does not stand alone, but is

and should be considered as an integral part of regulations which in their entirety require, as already observed, notice, sale in the county where the land lies, customary days and hours, and public auction, and accentuate the beneficial effect of the whole scheme, which, to say the least, is materially aided by the regulation as to place of sale. These provisions reasonably tend to assist in guaranteeing that mortgages and deeds of trust shall not have the effect of absolute conveyances, but shall have that of security only.
*Wylie v. Hays*, 114 Tex. 46, 263 S.W. 563, 567 (1924).

36. We note, for example, that *Wylie* was decided in 1924, a time when transportation over long distances was relatively more difficult than it now is.

counties, might relieve the debtor of some of the costs for which it could otherwise be liable. In any event, even Emmes's interpretation of section 51.002(a) allows, but does not require, the trustee to sell encumbered property that is located in more than one county in only one of the counties in which the property is located. *See* TEX. PROP.CODE ANN. § 51.002(a) (providing that "if the property is located in more than one county, the sale *may* be made at the courthouse in any county in which the property is located.") (emphasis added). That the trustee thus has flexibility under Emmes's interpretation concerning the place of sale lessens the likelihood that the Hobson's choice that appellants imagine would "inevitably" occur.

### b. The legislative history

For the first time on rehearing, the Segals direct us to legislative history that they claim supports their interpretation. *See* TEX. GOV'T CODE ANN. § 311.023(3) (allowing courts to consider legislative history).

Immediately before its amendment in 1987, section 51.002 read in pertinent part:

(a) A sale of real property under a power of sale conferred by a deed of trust or other contract lien must be a public sale at auction held between 10 a.m. and 4 p.m. of the first Tuesday of a month. The sale must take place in the county in which the land is located, or if the property is located in more than one county, the sale may be made in any county in which the property is located.

(b) Notice of the sale must be given at least 21 days before the date of the sale:

(1) by posting at the courthouse door of each county in which the property is located a written notice designating the county in which the property will be sold; and

(2) by filing in the office of the county clerk of each county in which the property is located a copy of the notice posted under Subdivision (1); and

(3) by the holder of the debt to which the power of sale is related serving written notice of the sale by certified mail on each debtor who, according to the records of the holder of the debt, is obligated to pay the debt....

Act of May 26, 1983, 68th Leg., R.S., ch. 576, 1983 Tex. Gen. Laws 3475, 3525 (amended 1984, 1987) (current version at TEX. PROP.CODE ANN. § 51.002(a), (b) (Vernon 1995)). After its amendment in 1987, the statute read in pertinent part:

(a) A sale of real property under a power of sale conferred by a deed of trust or other contract lien must be a public sale at auction held between 10 a.m. and 4 p.m. of the first Tuesday of a month. The sale must take place *at the county courthouse* in the county in which the land is located, or if the property is located in more than one county, the sale may be made *at the courthouse in any county in which the property is located. The commissioners court shall designate the area at the courthouse where the sales are to take place and shall record the designation in the real property records of the county. If no area is designated by the commissioners court, the notice of sale must designate the area at the courthouse where the sale covered by that notice is to take place, and the sale must occur in that area.*

(b) Notice of the sale, *which must include a statement of the earliest time at which the sale will occur,* must be given at least 21 days before the date of the sale:

(1) by posting at the courthouse door of each county in which the property is located a written notice designating the

county in which the property will be sold; and

(2) by filing in the office of the county clerk of each county in which the *property is located a copy of the notice posted under Subdivision (1)*; and

(3) by the holder of the debt to which the power of sale is related serving written notice of the sale by certified mail on each debtor who, according to the records of the holder of the debt, is obligated to pay the debt. . . .

*(c) The sale must begin at the time stated in the notice of sale or not later than three hours after that time. . . .*

Act of May 19, 1987, 70th Leg., R.S., ch. 540, § 1, 1987 Tex. Gen. Laws 2174, 2174 (amended 1993) (current version at TEX. PROP.CODE ANN. § 51.002(a)-(c) (Vernon 1995)) (emphasis shows text added by amendment).

In support of their interpretation of section 51.002(a), the Segals rely on the italicized portions of the House committee analysis for the bill underlying the 1987 amendment:

*PURPOSE*

This bill seeks to address two problematic areas in present law: the uncertain location and time of the auction, and the possibility that a residential debtor's right to cure may be subject to waiver in the deed of trust.

*SECTION BY SECTION ANALYSIS*

Section 1 incorporates the amendments to section 51.002, Property Code.

*Subsection (a) is amended to require that the public auction of real property must be at the courthouse in the county where the land is located.* The commissioners' court may designate the area at the courthouse where all such auctions will take place; if no designation is made, the notice of sale must specify the area.

Subsection (b) is amended to require that the notice of sale must include the earliest time at which the sale may occur.

Subsection (e) is amended to require that the sale must occur at the time recited in the notice, or not later than three hours after that time. . . .

HOUSE COMM. ON BUS. & COMM., BILL ANALYSIS, Tex. H.B. 1504, 70th Leg., R.S. (1987) (emphasis added). The Segals claim that the italicized portion of the bill analysis demonstrates an intent that the sale be held in each county in which a non-contiguous piece of land is located, not in one county in which any piece of land covered by the deed of trust may lie. They focus on the final words in the bill analysis's statement that "[s]ubsection (a) is amended to require that the public auction of real property must be at the courthouse *in the county where the land is located.*" *See id.* (emphasis added). We disagree with the Segals' focus and with their conclusion.

Even before the 1987 amendment, section 51.002(a) provided that the sale be held "in the county in which the land was located." *See* Act of May 26, 1983, 68th Leg., R.S., ch. 576, 1983 Tex. Gen. Laws 3475, 3525 (amended 1987). The 1987 amendment carried forward this requirement without change. The referenced statement in the 1987 bill analysis thus could not have concerned a change in the county of sale. Rather, what the bill analysis explained, and what the 1987 amendment corrected, was confusion about the time and place of the sale *within* the county of sale. As the bill analysis explains, the 1987 amendment solved that problem by requiring that the sale be held *in a particular portion of the courthouse* of the county of sale and *at a specified time. See* HOUSE COMM. ON BUS. & COMM., BILL ANALYSIS, Tex. H.B. 1504, 70th Leg., R.S. (1987). Because the focus of the 1987 Legislature

was on the place and time of sale within the county of sale, rather than on which county itself was the proper county of sale, the legislative history that the Segals cite does not support their position or resolve the ambiguity concerning the proper county of sale.

### c. The circumstances surrounding enactment (here, codification)

The Segals next argue that the Legislature "specifically replaced the previous foreclosure statute" by codifying section 51.002(a)'s immediate predecessor in 1983. Apparently recognizing that the fact of codification does not help their position if the codified law did not substantively change its immediate predecessor,[37] the Segals also argue that codified section 51.002(a) substantively differed from its immediate predecessor, former Revised Civil Statute article 3810.[38] *See* 1925 TEX. REV.CIV. STAT. 1022–23 (amended 1983) (current version at TEX. PROP.CODE ANN. § 51.002(a) (Vernon 1995)) [hereinafter "former article 3810"].

Former article 3810 read as follows:

*All sales of real estate made under powers conferred by any deed of trust or other contract lien shall be made in the county in which such real estate is situated. Where such real estate is situated in more than one county then notices as herein provided shall be given in both or all of such counties, and the real estate may be sold in either county, and such notice shall designate the county where the real estate will be sold.* Notice of such proposed sale shall be given by posting written notice thereof at least 21 days preceding the date of the sale at the courthouse door of the county in which the sale is to be made, and if *the real estate* is in more than one county, one notice shall be posted at the courthouse door *of each county in which the real estate is situated.*

*Id.* (emphasis added). Former article 3810's language does not materially differ in pertinent part from that of section 51.002(a) and does not show that the Legislature intended to break from prior law in codifying section 51.002(a).

### d. The former law

Appellants alternatively argue that, even if section 51.002(a) did not differ materially from its immediate predecessor (former section 3810, enacted in 1925), an earlier version of former article 3810, enacted in 1915, nonetheless did differ materially. Appellants argue that the abandoned 1915 statutory version probably supported Emmes's interpretation, but that all subse-

---

37. *Compare* TEX. PROP.CODE ANN. § 1.001(a) (Vernon 1984) ("This code is enacted as a part of the state's continuing statutory revision program.... The program contemplates a topic-by-topic revision of the state's general and permanent statute law without substantive change.") *with Fleming Foods of Tex., Inc. v. Rylander,* 6 S.W.3d 278, 286 (Tex.1999) ("We are compelled to conclude that when, as here, specific provisions of a 'nonsubstantive' codification and the code as a whole are direct, unambiguous, and cannot be reconciled with prior law, the codification rather than the prior, repealed statute must be given effect.").

38. Actually, the Segals' rehearing motion does not cite to section 51.002(a)'s immediate predecessor, but to a 1915 predecessor. *See* Act of March 10, 1915, 34th Leg., R.S., ch. 43, § 1, 1915 Tex. Gen. Laws 84 (appearing at former TEX.REV.CIV. STAT. ART. 3759), *amended by* Act of May 28, 1915, 34th Leg., 1st C.S., ch. 15, § 2, 1915 Tex. Gen. Laws 32, 32–33 (amended 1925) (current version at TEX. PROP. CODE ANN. § 51.002(a) (Vernon 1995)) (appearing at former TEX.REV.CIV. STAT. art. 3759 and retaining key language). The statute that the Segals cite was not, however, the statute that the Code replaced. We discuss the 1915 statute and the Segals' arguments under it further below.

quent statutory versions—including section 51.002(a) and former article 3810—support appellants' interpretation. Therefore, appellants argue that section 51.002(a) reflects the Legislature's long-standing decision (since 1925, with the enactment of former article 3810) to abandon the statutory interpretation that Emmes espouses.

Since its adoption in 1889, with one exception, the Texas foreclosure statute has generally required that sales of real estate under powers conferred by deed of trust be made in the county in which the property lies, with the exception that, if the property is located in more than one county, the sale may occur in any county in which the property is located, as long as notice of the sale is given in each county in which the property is located.[39] Current section 51.002(a) falls into this category:

> A sale of *real property* under a power of sale conferred by a deed of trust or other contract lien ... must take place at the county courthouse in the county in which *the land* is located, *or if the property is located in more than one county, the sale may be made at the courthouse in any county in which the property is located.* ...

Tex. Prop.Code Ann. § 51.002(a) (emphasis added).

In 1915, however, the Legislature amended the statute, then former Revised Civil Statute article 3759, to read as follows:

> All sales of real estate made in this state under powers conferred by any deed of trust or other contract lien shall be made in the county in which such real estate is situated, unless such real estate be situated in more than one county, in which event, notices as herein provided shall be given in both or all of such counties, providing and giving notice that *such sale will be made of such real estate in that one of said counties in which the greater portion of the real estate may be situated; if equal quantities of said land to be sold lie in different counties, said notice shall designate in which of said counties the sale is to be made.*

See Act of March 10, 1915, 34th Leg., R.S., ch. 43, § 1, 1915 Tex. Gen. Laws 84 (amended 1915); Act of May 28, 1915, 34th Leg., 1st C.S., ch. 15, § 2, 1915 Tex. Gen. Laws 32, 32–33 (amended 1925) (both appearing at former Tex.Rev.Civ. Stat. art. 3759) (emphasis added) [hereinafter "former article 3759"].

Appellants claim that former article 3759's italicized language (1) differed materially from the language used in all other versions the statute and (2) probably did support Emmes's position. Appellants then argue that, because former article 3759's italicized language was abandoned in all subsequent statutory versions, the Legislature intended to reject any meaning that might have supported Emmes's position about where land lying in multiple counties could be sold. We disagree.

Former article 3759's language did differ, but not in any way materially affecting

---

**39.** The differences among the statutory versions mentioned in this sentence were not material. *See* Act approved Mar. 21, 1889, 21st Leg., R.S., ch. 118 § 1, 1889 Tex. Gen. Laws 143, 143, *reprinted in* 9 H.P.N. Gammel, The Laws of Texas 1822–1897, at 1171, 1171 (Austin, Gammel Book Co. 1898) (amended 1895); 1895 Tex.Rev.Civ. Stat. 469–70 (amended 1911); 1911 Tex.Rev.Civ. Stat. 773 (amended 1915); 1925 Tex.Rev.Civ. Stat. 1022–23 (amended 1983); Act of May 26, 1983, 68th Leg., R.S., ch. 576, 1983 Tex. Gen. Laws 3475, 3525 (amended 1987); Tex. Prop.Code Ann. § 51.002(a) (last amended by Act of May 19, 1987, 70th Leg., R.S., ch. 540, § 1, 1987 Tex. Gen. Laws 2174, 2174). The opinion's Appendix sets out the language of each predecessor statute to current section 51.002(a).

our consideration. Specifically, former article 3759 was ambiguous for the same reasons that section 51.002(a) is ambiguous, and both statutory versions can thus be read to support either appellants' interpretation or Emmes's interpretation concerning county of sale.

For example, former article 3759 used the terms "real estate" and "land." Section 51.002(a) uses the terms "real property," "land," and "property." Each of these terms used in either statute can be synonyms. *See* RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 1079, 1550, 1607 (2nd ed.1987). Additionally, the initial use of the term "real estate" in former article 3759 could have referred to one or to multiple pieces of property.[40] *See id.* at 1607 (not distinguishing between singular and plural forms of these terms). Similarly, as we have already discussed, section 51.002(a)'s initial use of "real property" indicates that "real property" can be singular or plural, too. *See* TEX. PROP.CODE

ANN. § 51.002(a).[41] And, finally, as we have also concluded concerning section 51.002(a), former article 3759's subsequent uses of "real estate" (and of "land") did not clarify whether the statute was referring to one piece of land that straddled two or more counties or to multiple pieces of land that each lay in a separate county.[42] *See* Act of March 10, 1915, 34th Leg., R.S., ch. 43, § 1, 1915 Tex. Gen. Laws 84 (amended 1915); Act of May 28, 1915, 34th Leg., 1st C.S., ch. 15, § 2, 1915 Tex. Gen. Laws 32, 32–33 (amended 1925). Therefore, any differences between former article 3759 and all other statutory versions (including section 51.002(a)) are immaterial for purposes of our issue.

Appellants rely heavily on former article 3759's express provision allowing for notice in multiple counties, but for sale in the one county in which the greater portion of real estate lay. They note that section 51.002(a) does not itself contain a provision allowing notice in several counties, but sale

---

**40.** Former article 3759 began, "All sales of *real estate* made … under powers conferred by any deed of trust...." Act of March 10, 1915, 34th Leg., R.S., ch. 43, § 1, 1915 Tex. Gen. Laws 84 (amended 1915); Act of May 28, 1915, 34th Leg., 1st C.S., ch. 15, § 2, 1915 Tex. Gen. Laws 32, 32–33 (amended 1925) (emphasis added).

**41.** Section 51.002(a) begins, "A sale of *real property* under a power of sale made by a deed of trust...." TEX. PROP.CODE ANN. § 51.002(a) (emphasis added.)

**42.** For example, former article 3759 required that the "real estate" be sold "in the county in which the real estate is situated," unless "such real estate" was "situated in more than one county," in which case notice had to be made in "both or all of said counties" that "such sale" of "such real estate" would be made in "that one of said counties in which the greater portion of the real estate" was situated. Act of March 10, 1915, 34th Leg., R.S., ch. 43, § 1, 1915 Tex. Gen. Laws 84 (amended 1915); Act of May 28, 1915, 34th Leg., 1st C.S., ch. 15, § 2, 1915 Tex. Gen.

Laws 32, 32–33 (amended 1925). The use of "such" before "real estate" says nothing about how many pieces of land are meant. Neither does the use of "the" before "real estate" in the last part of the above quotation: the definite article could signify one piece of real estate or could instead simply refer back to the terms "real estate" or "such real estate" that were used earlier in the article. Similarly, the reference to the county in which the "greater portion" of real estate lies could mean the greater portion of the same piece of land that itself lies in more than one county or the most substantially-sized piece of land of all of the pieces of land that are covered by the same deed of trust. We also note that former article 3759 further provided that if "equal quantities" of "said land" lay in different counties, the notice of sale had to designate "in which of said counties" the sale would be held. *Id.* As with the term "greater portion," the term "equal quantities" could mean equal quantities of the same piece of land lying in multiple counties or equally sized, separate properties lying in different counties, but covered by the same deed of trust.

in one. However, sections 51.002(a) and 51.002(b), read together, do so provide: section 51.002(a) allows the sale "in any county in which the property is located," while section 51.002(b) requires notice in "each county in which the property is located." *See* TEX. PROP.CODE ANN. §§ 51.002(a), 51.002(b).

Accordingly, we hold that the Legislature did not, by discontinuing the wording of former article 3759, necessarily reject the interpretation of section 51.002(a) that Emmes espouses.

### 3. The Doctrine of Legislative Acceptance Resolves the Ambiguity

 When the Legislature re-enacts without material change an ambiguous statute that has been given a long-standing judicial interpretation, we presume that the Legislature intended the statute to have the meaning ascribed by the courts. *See, e.g., Marmon v. Mustang Aviation, Inc.,* 430 S.W.2d 182, 187 (Tex.1968); *Cunningham v. Cunningham,* 120 Tex. 491, 40 S.W.2d 46, 50 (1931); *see also City of Austin v. S.W. Bell Tel. Co.,* 92 S.W.3d 434, 445 (Tex.2002) (same, concerning agency's administrative interpretation).

The only case on point is *Bateman v. Carter–Jones Drilling Co.,* which supports Emmes's interpretation of section 51.002(a).[43] *See id.,* 290 S.W.2d 366 (Tex. Civ.App.-Texarkana 1956, writ ref'd n.r.e.). The appellants in *Bateman* argued that the sale of one single tract among five tracts of land encumbered under a deed of trust, which single tract lay in Gregg County, was void for having taken place in neighboring Rusk County, where the four

other tracts of land encumbered under the deed of trust were situated. *Id.* at 370. The Gregg County tract was not contiguous with any of the Rusk County tracts. *Id.* at 369. Construing former article 3759 (the 1915 predecessor of section 51.002(a) discussed in the preceding section), the *Bateman* court held that the sale of the Gregg County land in Rusk County was valid. *Id.* at 370–71. The *Bateman* court reasoned as follows:

> It is the contention of plaintiffs that such statute provides for the sale of lands in a different county from that in which it is situated only in case the land is contiguous to the tract or tracts of land in the county in which the sale is held. Some states have so construed a similar statute. In view of the broad language used in our statute, we do not believe that to be a proper construction. Surely the Legislature, when they [sic] made the provision for the sale of land where the greater portion thereof is situated and if in equal quantities the notice shall designate in which of said counties the sale is to be made, did not anticipate that land could be situated in a half-dozen or more counties and likely to be contiguous, one tract to the other, making a complete chain back to the county in which the sale was to be held.

*Id.* at 370.

We have already held that former article 3759, which the *Bateman* court construed, and current section 51.002(a) do not differ in any material way for purposes of the issue under consideration. *Compare* Act of March 10, 1915, 34th Leg., R.S., ch. 43,

---

43. The *Bateman* court relied on *Lewis v. Dainwood,* 130 S.W.2d 456 (Tex.Civ.App.-San Antonio 1939, writ ref'd), to support its holding on place of sale. *See Bateman v. Carter–Jones Drilling Co.,* 290 S.W.2d 366, 370–71 (Tex. Civ.App.-Texarkana 1956, writ ref'd n.r.e.). However, it is unclear from the *Lewis* opinion whether that court was considering one tract of land that crossed county lines or two non-contiguous tracts of land lying in adjacent counties. *See Lewis,* 130 S.W.2d at 456, 457. Therefore, we cannot say that *Lewis* is on point.

§ 1, 1915 Tex. Gen. Laws 84 (amended 1915) (former Tex.Rev.Civ. Stat. art. 3759, considered in *Bateman*) *with* Tex. Prop. Code Ann. § 51.002(a) (considered in this appeal). Since *Bateman*, the Legislature has amended former article 3759, codified that amendment as section 51.002(a), and once amended section 51.002(a). *See* 1925 Tex.Rev.Civ. Stat. 1022–23 (appearing at former Tex.Rev.Civ. Stat. art. 3810) (amended 1983); Act of May 26, 1983, 68th Leg., R.S., ch. 576, 1983 Tex. Gen. Laws 3475, 3525 (amended 1987); Act of May 19, 1987, 70th Leg., R.S., ch. 540, § 1, 1987 Tex. Gen. Laws 2174, 2174 (adopting current version of Tex. Prop.Code Ann. § 52.001(a)). As shown above, at no time was section 51.002(a)'s language changed in a material way that would have defeated *Bateman's* relevant holding.[44] We also note that, in addition to the 1987 amendment to section 51.002(a) noted above, the Legislature has three times amended other subsections of section 51.002 after *Bateman*, but in none of those instances did it alter the language of subsection (a). *See* Act of July 3, 1984, 68th Leg., 2nd C.S., ch. 18, § 3(b), 1984 Tex. Gen. Laws 94, 95 (amended 1993) (amending section 51.002(b) and adding section 51.002(d)); Act of April 15, 1993, 73rd Leg., R.S., ch.

48, § 5, 1993 Tex. Gen. Laws 97, 98–99 (amended 2003) (amending sections 51.002(b) and 51.002(d) and adding section 51.002(g)); Act of June 1, 2003, 78th Leg., R.S., ch. 554, § 2, 2003 Tex. Gen. Laws 1897, 1898–99 (amending sections 51.002(b), (d), and (e)). In fact, the last such amendment came in June 2003, after our opinion on original submission in this case had expressly adopted *Bateman's* holding concerning the county of sale under section 51.002(a), yet the Legislature still did not change subsection (a). *See* Act of June 1, 2003, 78th Leg., R.S., ch. 554, § 2, 2003 Tex. Gen. Laws 1897, 1898–99.

Accordingly, we presume that the Legislature intended to adopt *Bateman's* interpretation. *See, e.g., Marmon*, 430 S.W.2d at 187. We thus hold that the trustee properly conducted the sales of all tracts of land under the deed of trust in a county in which the sales were allowed by section 51.002(a). Therefore, the trial court did not err in implicitly concluding that the sales of tracts 2 and 3b were valid, in granting Emmes' summary judgment motion on this ground, and in denying appellants' summary judgment challenges to the validity of these tracts' sales.

---

**44.** Upon codification, the Legislature replaced the term "real estate" with the terms "real property," "land," and "property," but we find this change neither material nor substantive. First, as discussed earlier, the terms "real property," "land," "property," and "real estate" can be synonyms. *See* Random House Webster's Unabridged Dictionary 1079, 1550, 1607 (2nd ed.1987). Second, the rare times that the Legislature did use the term "land" in two of the statute's pre-codification versions, the context clearly showed that the Legislature intended that term to mean "real estate." *See* Act of March 10, 1915, 34th Leg., R.S., ch. 43, § 1, 1915 Tex. Gen. Laws 84 (amended 1915); Act of May 28, 1915, 34th Leg., 1st C.S., ch. 15, § 2, 1915 Tex. Gen. Laws 32, 32–33 (amended 1925). Third, other than those two pre-codification uses of

the term "land," the Legislature consistently used the term "real estate" in the pre-codification statutes. *See* Act approved Mar. 21, 1889, 21st Leg., R.S., ch. 118 § 1, 1889 Tex. Gen. Laws 143, 143, *reprinted in* 9 H.P.N. Gammel, The Laws of Texas 1822–1897, at 1171, 1171 (Austin, Gammel Book Co. 1898) (amended 1985); 1895 Tex.Rev.Civ. Stat. 469–70 (amended 1911); 1911 Tex.Rev.Civ. Stat. 773 (amended 1915); Act of March 10, 1915, 34th Leg., R.S., ch. 43, § 1, 1915 Tex. Gen. Laws 84 (amended 1915); Act of May 28, 1915, 34th Leg., 1st C.S., ch. 15, § 2, 1915 Tex. Gen. Laws 32, 32–33 (amended 1925); 1925 Tex.Rev.Civ. Stat. 1022–23 (amended 1983). We thus doubt that the Legislature intended to change the statute's substantive meaning merely by replacing the term "real estate" with synonyms upon codification.

We overrule the Fogartys' second issue and the Segals' sixth issue.

## V. Conclusion

We affirm the judgment of the trial court.

Justice COHEN,[45] who was a member of the panel at the time of original submission of the cause and who retired from the Court before the issuance of the opinion, not participating.

Justice SMITH,[46] a member of the panel at the time of original submission of the cause, not participating on rehearing.

## APPENDIX

1. **Act approved Mar. 21, 1889, 21st Leg., R.S., ch. 118 § 1, 1889 Tex. Gen. Laws 143, 143, *reprinted in* 9 H.P.N. Gammel, The Laws of Texas 1822– 1897, at 1171, 1171 (Austin, Gammel Book Co. 1898) (amended 1895)**

"That *all sales of real estate* which may hereafter be *made in this state under powers conferred by any deed of trust* or other contract lien *shall be made in the county in which such real estate is situated,* notice shall be given as now required in judicial sales, and such sales shall be made at public vendue, between the hours of 10 o'clock a.m. and 4 o'clock p.m. of the first Tuesday in any month: *Provided, That* when such real estate is situated in an unorganized county such sale shall be made in the county to which such unorganized county is attached for judicial purposes, and *where such real estate is situated in two or more counties the sale may be made in any county where any part of the real estate is situated,* after notice as required in judicial sales has been given *in every county in which any part of such real estate is situated."* (Emphasis added.)

2. **1895 Tex.Rev.Civ. Stat. 469–70 (amended 1911) (appearing at former Tex.Rev.Civ. Stat. art. 2369)**

"*All sales of real estate made in this state under powers conferred by any deed of trust* or other contract lien *shall be made in the county in which such real estate is situated.* Notice shall be given as now required in judicial sales, and such sales shall be made at public vendue, between the hours of ten o'clock a.m. and four o'clock p.m. of the first Tuesday in any month; *provided, that* when such real estate is situated in an unorganized county such sale shall be made in the county to which such unorganized county is attached for judicial purposes, and *where such real estate is situated in two or more counties the sale may be made in any county where any part of the real estate is situated,* after notice as required in judicial sales has been given *in every county in which any part of such real estate is situated."* (Emphasis added.)

3. **1911 Tex.Rev.Civ. Stat. 773 (amended 1915) (appearing at former Tex.Rev. Civ. Stat. art. 3759)**

"*All sales of real estate made in this state under powers conferred by any deed of trust* or other contract lien *shall be made in the county in which such real estate is situated.* Notice shall be given as now required in judicial sales; and such sales shall be made at public vendue, between the hours of ten o'clock a. m. and four o'clock p. m. of the first Tuesday in any month; *provided, that,* when such real es-

---

45. The Honorable Murry B. Cohen, retired Justice, Court of Appeals, First District of Texas at Houston.

46. The Honorable Jackson B. Smith, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

tate is situated in an unorganized county, such sale shall be made in the county to which such unorganized county is attached for judicial purposes, and, *where such real estate is situated in two or more counties, the sale may be made in any county where any part of the real estate is situated,* after notice as required in judicial sales has been given *in every county in which any part of such real estate is situated.*" (Emphasis added.)

4. **Act of March 10, 1915, 34th Leg., R.S., ch. 43, § 1, 1915 Tex. Gen. Laws 84 (amended 1915) (appearing at former Tex.Rev.Civ. Stat. art. 3759)**

"*All sales of real estate made in this state under powers conferred by any deed of trust* or other contract lien *shall be made in the county in which such real estate is situated, unless such real estate be situated in more than one county,* in which event notices as herein provided shall be given in *both or all of such counties,* providing and giving notice that *such sale will be made of such real estate in that one of said counties* in which the greater portion of *the real estate* may be situated; if equal quantities *of said land* to be sold lie in different counties, said notice shall designate *in which of said counties the sale is to be made.*" (Emphasis added.)

5. **Act of May 28, 1915, 34th Leg., 1st C.S., ch. 15, § 2, 1915 Tex. Gen. Laws 32, 32–33 (amended 1925) (appearing at former Tex.Rev.Civ. Stat. art. 3759)**

"*All sales of real estate made in this state under powers conferred by any deed of trust* or other contract lien *shall be made in the county in which such real estate is situated, unless such real estate be situated in more than one county,* in which event, notices as herein provided shall be given in *both or all of such counties,* pro-

viding and giving notice that *such sale will be made of such real estate in that one of said counties* in which the greater portion of the real estate may be situated; if equal quantities *of said land* to be sold lie in different counties, said notice shall designate *in which of said counties the sale is to be made.*" (Emphasis added.)

6. **1925 Tex.Rev.Civ. Stat. 1022–23 (amended 1983) (appearing at former Tex.Rev.Civ. Stat. art. 3810)**

"*All sales of real estate made under powers conferred by any deed of trust* or other contract lien *shall be made in the county in which such real estate is situated. Where such real estate is situated in more than one county* then notices as herein provided shall be given *in both or all of such counties, and the real estate may be sold in either county, and such notice shall designate the county where the real estate will be sold.* Notice of such proposed sale shall be given by posting written notice thereof for three consecutive weeks prior to the day of sale in three public places *in said county or counties,* one of which shall be made at the courthouse door of the county in which such sale is to be made, and if *such real estate be in more than one county,* one at the courthouse door of *each county* in which *said real estate may be situated. ...*" (Emphasis added.)

7. **Act of May 26, 1983, 68th Leg., R.S., ch. 576, 1983 Tex. Gen. Laws 3475, 3525 (amended 1984) (current version at Tex. Prop.Code Ann. § 51.002(a) (Vernon 1995))**

"A sale of real property under a power of sale conferred by a deed of trust or other contract lien must be a public sale at auction held between 10 a.m. and 4 p.m. of the first Tuesday of a month. The sale *must take place in the county in which the*

*land is located, or if the property is located in more than one county,* the sale may be made *in any county in which the property is located. . . . .* " (Emphasis added.)

8. TEX. PROP.CODE ANN. § 51.002(a) (Vernon 1995) (last amended by Act of May 19, 1987, 70th Leg., R.S., ch. 540, § 1, 1987 Tex. Gen. Laws 2174, 2174)

*"A sale of real property under a power of sale conferred by a deed of trust* or other contract lien must be a public sale at auction held between 10 a.m. and 4 p.m. of the first Tuesday of a month. The sale *must take place* at the county courthouse *in the county in which the land is located, or if the property is located in more than one county,* the sale may be made at the courthouse *in any county in which the property is located. . . . .* " (Emphasis added.)