TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-10-00460-CV






Ralph Kelly, Appellant


v.


First State Bank Central Texas, Appellee






FROM THE DISTRICT COURT OF BELL COUNTY, 169TH JUDICIAL DISTRICT

NO. 230,687-C, HONORABLE GORDON G. ADAMS, JUDGE PRESIDING




M E M O R A N D U M O P I N I O N



 This suit involves a deficiency action against a guarantor of promissory notes
following the non-judicial foreclosure sale of real properties securing the notes. See Tex. Prop. Code
Ann. §§ 51.003, .005 (West 2007). Ralph Kelly, the guarantor, appeals from a final summary
judgment in favor of First State Bank Central Texas, the lender, for the unpaid balances owed on the
notes. In five issues, Kelly challenges the deficiency summary judgment against him based upon the
doctrine of judicial estoppel and remaining issues of fact. Because we conclude that judicial estoppel
does not apply and that First State conclusively established its claim for a deficiency judgment, we
affirm the summary judgment.


BACKGROUND

 The underlying facts are not in dispute. Kelly's son Michael Kelly was the president
of Primera Homes Corporation, a homebuilder. First State loaned money to Primera to finance the
construction of homes on two properties, the Cielo Circle Property and the Lariat Property. Primera
executed a promissory note dated April 28, 2005, in the original principal sum of $488,750 ("Note
1"), secured by the Cielo Circle Property, and a promissory note dated November 9, 2005, in the
original principal amount of $255,082 ("Note 2"), secured by the Lariat Property. Primera and
First State executed security agreements, deeds of trust, and financing statements, and Ralph Kelly
and his son executed personal guaranty agreements that secured the notes.

 During the course of the loans, the parties also agreed to extend and modify the notes. 
The parties, including Kelly, executed the Third Modification of Note and Security Documents and
the Fourth Modification of Note and Security Documents as to Note 1 and the Second Modification
of Note and Security Documents as to Note 2.

 In 2007, the notes matured and became due in full. Primera, however, defaulted on
both notes, and, around that time, Kelly's son and Primera filed for bankruptcy protection. In the
bankruptcy proceedings, First State moved to lift the automatic stay as to the Cielo Circle Property
and the Lariat Property, contending that the debtors did not have equity in either property and that
the properties were not necessary for an effective reorganization. See 11 U.S.C.A. § 362(d) (West
Supp. 2010). To support its motions, First State filed an affidavit from its president and appraisals
of the properties. The president averred that, "[b]ased upon appraisals performed by the Bank," the
bank "believes the fair market value of the Cielo Circle Property to be $620,000 [and] the fair market
value of the Lariat Property to be $262,000." First State also listed the outstanding existing lien
claims on the two properties, including the amounts of its own lien claims. (1) The total amount of the
existing lien claims exceeded First State's represented fair market value for each of the properties. 
The bankruptcy court granted First State's motions and lifted the automatic stay.

 After the automatic stay was lifted, First State noticed and then sold the properties
at a non-judicial foreclosure sale in November 2007. At the foreclosure sale, First State purchased
the properties by bids in the amounts of $468,000 and $185,000, for a combined total of $653,000. 
First State then brought this deficiency action in July 2008 against Kelly.

First State's Pleadings


 First State's deficiency action against Kelly sought to recover the unpaid balances
owed under the notes after offsetting the foreclosure sale prices plus interest, attorney's fees, and
costs. See Tex. Prop. Code Ann. § 51.003. Section 51.003(a) of the property code provides that a
suit to recover a deficiency judgment against a guarantor may be brought when "the price at which
real property is sold at a foreclosure sale . . . is less than the unpaid balance of the indebtedness
secured by the real property." Id. § 51.003(a). Here, it is undisputed that the properties' foreclosure
sale prices were below the unpaid balances of the notes.


First State's First Motion for Summary Judgment


 First State filed a motion for summary judgment in March 2009 based upon Kelly's
guaranties. Its summary judgment evidence included copies of the notes, the guaranty agreements,
the modification and extension agreements, and affidavits from a First State officer and its attorney. 
The officer averred concerning the non-judicial foreclosure sale of the two properties and the
combined deficiency on the notes after offsetting the foreclosure sale prices. He itemized the
principal, unpaid interest prior to February 18, 2009, appraisal fees, late fees, insurance fees, and the
per diem interest charge for each note:

 

 Note 1. After deducting the proceeds of the trustee's sale on November 6, 2007, and
after adding interest calculated as of February 18, 2009:


 Principal: $13,043.47

 Unpaid Interest ($6.06 per diem after 2/18/09) $48,230.24

 Appraisal fees: $ 450.00

 Late fees: $ 15.00

 $61,738.71


 Note 2. After deducting the proceeds of the trustee's sale on November 6, 2007, and
after adding interest calculated as of February 18, 2009:


 Principal: $ 66,670.39

 Unpaid Interest ($32.36 per diem after 2/18/09) $ 33,571.09

 Insurance fees: $ 1,858.27

 $105,099.75



The officer further averred that, "[a]fter giving Defendants credit for all just and lawful offsets,
credits and payments, the total balance, excluding attorney's fees . . . as of February 18, 2009 is
$166,838.46." The attorney opined that "the amount of reasonable and necessary attorney's fees and
attendant collection costs for the preparation and presentation of Plaintiff's entitlement to summary
judgment [was] $5,354.74."


Kelly's Pleadings, Responses, and Motion for Summary Judgment


 In response, Kelly filed an amended answer, a response to First State's motion for
summary judgment, and a competing summary judgment motion. In his amended answer, Kelly
pleaded, among his defenses, that judicial estoppel barred First State's deficiency claim, that the "fair
market value of the property, by Plaintiff's own admission, was greater than the foreclosure sales
price," and, alternatively, sought an offset based upon the properties' fair market values pursuant to
section 51.003(c) of the property code. See Tex. Prop. Code Ann. § 51.003.

 In his response to First State's motion for summary judgment, Kelly argued that there
were fact issues concerning the properties' fair market values and that judicial estoppel barred
First State's claims. His competing motion for summary judgment also was based upon judicial
estoppel. In both his response and his motion, he contended that First State was bound to the
properties' combined fair market value of $882,000, as represented to the bankruptcy court, and,
because this value was greater than the combined unpaid balances owed on the notes, that First State
was not entitled to a deficiency judgment against him as a matter of law. Kelly's summary judgment
evidence included First State's motion to lift the automatic stay in the Primera bankruptcy
proceeding, the affidavit of First State's president in support of the motion to lift the automatic stay,
and the bankruptcy order granting First State's motion. After a hearing in October 2009, the trial
court denied Kelly's motion for summary judgment. First State's motion for summary judgment
remained pending.


First State's Second Motion for Summary Judgment


 First State filed a second motion for summary judgment in December 2009 "to be
heard concurrently" with its first motion. In its second motion, First State urged that, as a matter of
law, Kelly contractually waived his statutory right "to challenge the resulting deficiency balance by
calling into question the fair market value of the real property." First State's evidence included a
copy of the Third Modification of Note and Security Documents. This document, as well as other
modification documents for both notes, contains the following waiver provision:


 To the maximum extent permitted by applicable law, each of the Obligors hereby
waives all rights, remedies, claims, and defenses based upon or related to
Sections 51.003 and 51.004 (and as to Guarantors, also Section 51.005) of the Texas
Property Code.



The modification documents define "Obligors" as the borrower and the guarantors. Kelly signed
each of these documents.

Kelly's Response


 Kelly responded to First State's second motion for summary judgment with evidence: 
(i) First State's motions to lift the automatic stay in the Primera and Michael Kelly bankruptcy
proceedings with First State's supporting affidavits, (ii) the bankruptcy orders granting the motions
to lift the automatic stay, (iii) appraisals of the Cielo Circle Property and the Lariat Property, and
(iv) an affidavit by Kelly. In his affidavit, Kelly averred that he was not involved with the
negotiation of the note modifications, he was not represented by counsel, he did not know at the time
that he signed the note modifications that he was waiving his statutory rights to have a jury decide
the properties' fair market values in the event of a foreclosure, he did not oppose First State's
motions to lift the automatic stay or attend the foreclosure sale based upon First State's
representations to the bankruptcy court that "the Properties securing the notes were $620,000.00 and
$262,000.00," and he "justifiably believed that there would be no deficiencies on these loans." He
further averred that he would have opposed the motions to lift the automatic stay and "refinanced
the loans and/or purchased the Properties" had he known that First State intended to purchase the
properties at an amount less than their fair market values as represented to the bankruptcy court.


The Trial Court's Disposition


 After another hearing, the trial court granted summary judgment in favor of
First State. The trial court rendered final summary judgment in the amount of $166,838.46 as the
amount due and owing as of February 18, 2009; $13,639.10 as additional prejudgment interest from
February 18, 2009, until judgment; $5,354.74 for attorney's fees; $215.00 for costs of court; and
postjudgment interest at the rate of five percent per year. Kelly filed a motion for new trial which
was overruled by operation of law. This appeal followed.


ANALYSIS


 Section 51.003(c) of the property code sets forth two values by which a deficiency
may be calculated: (1) fair market value as of the date of foreclosure, and (2) the foreclosure sale
price. Tex. Prop. Code Ann. § 51.003(c). "If no party requests the determination of fair market
value or if such request is made and no competent evidence of fair market value is introduced, the
sale price at the foreclosure sale shall be used to compute the deficiency." Id. A guarantor against
whom a deficiency judgment is sought, however, may request a determination of the property's fair
market value as of the date of the foreclosure sale and, if the fair market value is greater than the
foreclosure sale price, the guarantor is "entitled to an offset against the deficiency in the amount by
which the fair market value . . . exceeds the sale price." Id. § 51.003(b), (c) Section 51.003(b)
further provides that the "fair market value shall be determined by the finder of fact after the
introduction by the parties of competent evidence of the value." See id. § 51.003(b).

 Kelly does not dispute that First State's evidence conclusively established that Kelly
personally guaranteed the notes, that he signed note modification documents with contractual waiver
provisions, that the notes matured and became due in full, that Primera defaulted on the notes, that
the properties were properly noticed and sold at a non-judicial foreclosure sale, or that First State
successfully bid on the properties for a combined amount of $653,000, resulting in a deficiency claim
if the combined foreclosure sale price determines the deficiency. See id. § 51.003; Lee v. Martin
Marietta Materials Sw., Ltd., 141 S.W.3d 719, 720-21 (Tex. App.--San Antonio 2004, no pet.) (to
recover under guaranty contract, party must show (1) existence and ownership of guaranty contract,
(2) terms of underlying contract by holder, (3) occurrence of conditions upon which liability is based,
and (4) failure or refusal to perform promise by guarantor).

 Kelly's issues focus on whether First State may pursue its deficiency suit against him
at all based upon the doctrine of judicial estoppel and whether fact issues remain to preclude
summary judgment.


Standard of Review


 Kelly's issues challenge the trial court's summary judgment. We review summary
judgments de novo. See Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005);
Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 215 (Tex. 2003). To prevail on a
traditional motion for summary judgment, the movant must show that no genuine issue of material
fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c);
Southwestern Elec. Power Co. v. Grant, 73 S.W.3d 211, 215 (Tex. 2002). We take as true all
evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any
doubts in the nonmovant's favor. Dorsett, 164 S.W.3d at 661. When the parties file competing
motions for summary judgment, and one is granted and one is denied, we review the record, consider
all questions presented, and render the decision the trial court should have rendered. Id.


Judicial Estoppel


 Kelly's first and third issues are based upon the doctrine of judicial estoppel. Kelly
contends that First State's sworn representation to the bankruptcy court that the properties' combined
fair market value was $882,000--an amount greater than the unpaid balances on the
notes--precludes First State's deficiency suit against him as a matter of law, and, therefore, that
provisions in the loan documents waiving his statutory rights to a fair market valuation and offset
under section 51.003 of the property code are irrelevant. Kelly urges that First State's representation
to the bankruptcy court "was tantamount to a representation that no grounds for a deficiency
judgment against guarantor Kelly existed." By purchasing the properties at the foreclosure sale by
credit bid, Kelly further urges, First State received full value for the unpaid balances on the notes so
that any further recovery would be unjust and a double recovery.

 Because Kelly raises judicial estoppel in the context of First State's position in prior
bankruptcy proceedings, we apply federal law to our analysis of the issue. See Dallas Sales Co.
v. Carlisle Silver Co., 134 S.W.3d 928, 931 (Tex. App.--Waco 2004, pet. denied); Stephenson
v. LeBoeuf, 16 S.W.3d 829, 841-42 (Tex. App.--Houston [14th Dist.] 2000, pet. denied). Under
federal law, judicial estoppel is an equitable doctrine that protects the integrity of court proceedings
by preventing "'a party from asserting a claim in a legal proceeding that is inconsistent with a claim
taken by that party in a previous proceeding.'" New Hampshire v. Maine, 532 U.S. 742, 749 (2001)
(citation omitted). The doctrine generally applies when the position of the party to be estopped is
"clearly inconsistent" with its previous position and the party successfully persuaded the court to
accept that position, "so that the judicial acceptance of an inconsistent position in a later proceeding
would create 'the perception that either the first or second court was misled.'" Id. at 750-51.

 To support his position, Kelly relies upon cases in which a bankruptcy debtor was
judicially estopped from pursuing litigation claims that the debtor failed to disclose in the bankruptcy
proceeding. See, e.g., Reed v. City of Arlington, 620 F.3d 477, 481 (5th Cir. 2010); Superior
Crewboats, Inc. v. Primary P&I Underwriters (In re Superior Crewboats, Inc.), 374 F.3d 330, 333
(5th Cir. 2004). In Reed, the debtor violated bankruptcy law by "repeatedly misrepresent[ing] his
assets and conceal[ing] from the trustee, the creditors, and the court his million dollar judgment."
620 F.3d at 482. The Fifth Circuit applied judicial estoppel to bar the debtor from pursuing the
undisclosed judgment, noting that the failure to do so in that instance "would send debtors the
message that they 'should consider disclosing personal assets only if [they are] caught concealing
them.'" Id. at 482-83 (citation omitted).

 Similarly, in Superior Crewboats, the court found that judicial estoppel precluded the
debtors from prosecuting a personal injury suit that was not timely disclosed in a prior bankruptcy
proceeding, concluding that the debtors' positions in the bankruptcy court and personal injury suit
were inconsistent:


 It goes without saying that the Bankruptcy Code and Rules impose upon bankruptcy
debtors an express, affirmative duty to disclose all assets, including contingent and
unliquidated claims . . . . Thus, . . . , the [debtors'] omission of the personal injury
claim from their mandatory bankruptcy filings is tantamount to a representation that
no such claim existed.


374 F.3d at 335 (citation omitted, emphasis in original). In contrast with the bankruptcy debtors in
these cases, however, First State, as a secured lender, did not violate bankruptcy law or have an
affirmative duty to disclose to the bankruptcy court in its motion to lift the automatic stay its specific
intentions concerning the properties. See 11 U.S.C.A. § 362(d). Further, First State does not seek
to change its representations or stated position to the bankruptcy court here. (2)

 Kelly also misstates First State's substantive position to the bankruptcy court. Kelly
contends that First State's motion to lift the automatic stay was successful "[b]ased upon
representations that the Properties were worth more than the amounts owed." But, First State's
position was converse: First State did not seek for the stay to be lifted based upon the properties
being worth more than the unpaid balances on the notes but based upon the properties being worth
less than the outstanding liens on the properties. First State argued that the properties were not
necessary to an effective reorganization and that the debtors did not have equity in either property
because "existing liens exceed the value" of the properties. First State listed the existing liens,
provided evidence of the properties' fair market value, and sought a lift of the automatic stay "to
permit [First State] to seek any or all of its statutory, contractual or other available remedies,
specifically that [First State] be permitted to accelerate the indebtedness, if necessary, post the
properties for foreclosure and foreclose the liens."

 We conclude that First State's substantive position to the bankruptcy court--that the
properties were not necessary for a successful reorganization and that the debtors did not have equity
in the properties based in part upon the represented properties' fair market values--does not conflict
with this deficiency suit against Kelly based upon the foreclosure sale prices. See Tex. Prop. Code
Ann. §§ 51.002, .003. Further, the bankruptcy court's presumed acceptance of First State's
substantive position and the trial court's acceptance of First State's position here--that First State
conclusively proved its deficiency claim based upon the properties' foreclosure sale prices--do not
create a perception that either court was misled. See Maine, 532 U.S. at 750-51; see also In re
Saunders, 112 B.R. 844, 845 n.4 (Bankr. W.D. Tex. 1990). (3)

 Kelly also argues that allowing First State to recover a deficiency judgment would
be unjust. In his affidavit, Kelly averred that he would have opposed the motion to lift the automatic
stay or "refinanced the loans and/or purchased the Properties" if he had known that First State
planned to bid below the properties' fair market values. But Kelly does not seek to set aside the
foreclosure sale, and, once the automatic stay was lifted, First State was under no obligation to
proceed with the foreclosure sale, to bid on the properties at the foreclosure sale, or, if it chose to do
so, to bid only the fair market value. Texas law expressly allows a lender to purchase property at
a foreclosure sale and then to seek a deficiency claim against a guarantor based upon the
foreclosure sale price, without regard to the property's fair market value. See Tex. Prop. Code Ann.
§§ 51.002. .003. (4)

 First State also was under "no duty to take affirmative action, beyond that required
by statute or deed of trust, to ensure a 'fair' [foreclosure] sale." See Pentad Joint Venture v. First
Nat'l Bank, 797 S.W.2d 92, 96 (Tex. App.--Austin 1990, writ denied) (citation omitted) (evidence
that lender knew but did not disclose its intentions to guarantors before foreclosure sale that it would
bid below the fair market value did not void sale or preclude deficiency claim against guarantors
based upon foreclosure sale price); Biddle v. National Old Line Ins. Co., 513 S.W.2d 135, 138 (Tex.
Civ. App.--Dallas 1974, writ ref'd n.r.e.) (citation omitted) ("A mortgagee is obliged to conduct a
sale fairly and not to discourage bidding by acts or statements made before or during the sale . . . . 
The mortgagee is bound not to 'chill the bidding' by word or deed before or during the sale, but is
bound to conduct it fairly so as to produce as good a price as possible."). Given that First State's
actions concerning the foreclosure sale were within its rights as a secured lender, we cannot conclude
that allowing First State to proceed with its deficiency suit against Kelly would be unjust.

 We conclude that judicial estoppel does not apply to bar First State's deficiency claim
against Kelly and, therefore, that the contractual provisions in which Kelly waived his rights under
section 51.003 of the property code are relevant. See Tex. Prop. Code Ann. § 51.003; Maine,
532 U.S. at 750-51. We overrule Kelly's first and third issues and turn to Kelly's challenge to the
contractual waiver provision.


Contractual Waiver Provision


 In his fourth issue, Kelly challenges the contractual provisions waiving his statutory
rights under section 51.003 of the property code. See Tex. Prop. Code Ann. § 51.003. Kelly argues,
based upon section 51.003(b)'s requirement that the "finder of fact" determine fair market value, that
the contractual provisions are unenforceable because they deprive him of a trial by jury or, at a
minimum, that his affidavit raised a fact issue precluding summary judgment on whether he waived
his constitutional right to have a jury trial. See id. § 51.003(b); Tex. Const. art. I, § 15; art. V, § 10. 
"[A] waiver of constitutional rights must be voluntary, knowing, and intelligent, with full awareness
of the legal consequences." In re Prudential Ins. Co. of Am., 148 S.W.3d 124, 132 (Tex. 2004)
(citation omitted). In his affidavit, Kelly averred that he was not represented by counsel, that he did
not recall reading the waiver provision or any discussion of it, and that he did not know at the time
that he signed the note modifications that he "was waiving any statutory rights to have a jury decide
the fair market value in the event of a foreclosure." (5)

 Based upon the plain language of the waiver provisions, however, they do not address
Kelly's right to a jury trial but his statutory rights under the property code to a fair market valuation
and offset following a foreclosure sale. See Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.,
294 S.W.3d 164, 168 (Tex. 2009) (contract terms are given "plain and ordinary meaning unless the
instrument indicates the parties intended a different meaning"). Further, the right to a jury trial in
civil cases is not absolute, and the summary judgment process allows cases to be resolved without
a jury trial when no genuine issues of fact exist. See Bliss v. NRG Indus., 162 S.W.3d 434, 437 (Tex.
App.--Dallas 2005, pet. denied). When a party cannot show a material issue of fact, there is nothing
to submit to the jury and the granting of summary judgment does not violate the constitutional right
to a jury trial. Id. That is what happened here.

 We also note that courts that have considered and analyzed guarantors' challenges
to similar waiver provisions have upheld the provisions as enforceable and not against public policy. 
See Segal v. Emmes Capital, L.L.C., 155 S.W.3d 267, 279-80 (Tex. App.--Houston [1st Dist.] 2004,
pet. dism'd); LaSalle Bank Nat'l Ass'n v. Sleutel, 289 F.3d 837, 841-42 (5th Cir. 2002). In Sleutel,
the lender sought to recover a deficiency judgment against a guarantor after the lender purchased
property at a non-judicial foreclosure sale for $750,000. 289 F.3d at 838-39. According to the
guarantor, the property's fair market value was $1.6 million at the time of the foreclosure sale, and
the guarantor sought an offset under section 51.003 of the property code based upon the property's
fair market value. Id. The trial court granted partial summary judgment for the lender on the
guarantor's offset claim on the ground that the guarantor contractually waived the right to valuation
and offset and, on appeal, the guarantor challenged the waiver on public policy grounds. Id. at 840. 
The Sleutel court found persuasive the omission of language in section 51.003 precluding waiver to
hold that a guarantor may contractually waive the rights set forth in that section. Id. at 841-42.

 Consistent with the procedural posture in this case, the appeal in Segal was from a
summary judgment against guarantors for the unpaid balances on promissory notes after offsetting
the non-judicial foreclosure sale prices of properties securing the notes. 155 S.W.3d at 272-73. In
that case, the guarantors challenged a contractual provision waiving their rights to a fair market
valuation and offset under section 51.005 of the property code. Id. at 279-80; see Tex. Prop. Code
Ann. § 51.005 (West 2007). (6) The waiver provision in Segal is substantively similar to the waiver
provision here. It stated:


 To the maximum extent permitted by applicable law, [appellant] hereby waives all
rights, remedies, claims and defenses based upon or related to Sections 51.003,
51.004 and 51.005 of the Texas Property Code, to the extent the same pertain or may
pertain to any enforcement of this Guaranty.



Id. at 278. In affirming summary judgment against the guarantors, the Segal court cited and applied
the same reasoning as the Sleutel court, noting that there were "at least 11 other instances within the
Property Code, the Legislature has expressly stated that waivers of given rights, obligations,
liabilities, exemptions, etc. are void or voidable, either categorically or under certain conditions,"
and that the Legislature did not include similar prohibitive language in section 51.005. Id. at 279. 
The court concluded that "[t]his omission indicates strongly that the Legislature did not find the
protections afforded in section 51.005 to be so fundamental that they could not be waived
contractually" and that the contractual waiver provision was enforceable and not against public
policy. Id. at 279-80.

 We agree with the analysis and conclusions in Segal and Sleutel that a guarantor may
contractually waive his statutory rights to a fair market valuation and offset. We conclude that Kelly
did so here. The trial court, therefore, did not err by determining the deficiency judgment based upon
the undisputed evidence of the properties' foreclosure sale prices. See Tex. Prop. Code Ann.
§ 51.003(c). We overrule Kelly's issue challenging the contractual waiver provisions. Further,
because we conclude that Kelly waived his statutory rights to a fair market valuation and offset, the
properties' fair market value is immaterial to the deficiency determination, and we need not reach
Kelly's issue in which he contends that he raised a fact issue on the properties' fair market value. 
See Segal, 155 S.W.3d at 284 ("Because [guarantors] validly waived their rights to seek a
fair-market-value determination and an offset, it is immaterial whether [the guarantors] raised a fact
issue on the three properties' fair-market value.").


Amount of the Deficiency Judgment


 In his fifth issue, Kelly contends that, even if the foreclosure sale prices were the
correct measure for determining the deficiency judgment, the trial court incorrectly calculated the
remaining balance and interest owed under the notes, and he seeks a remand to correct the
judgment's amount. But, "[a] lender need not file detailed proof reflecting the calculations of the
balance due on a note; an affidavit by a bank employee which sets forth the total balance due on a
note is sufficient to sustain an award of summary judgment." Scott v. Commercial Servs. of Perry,
Inc., 121 S.W.3d 26, 29 (Tex. App.--Tyler 2003, pet. denied) (citing Martin v. First Republic Bank,
Fort Worth, N.S., 799 S.W.2d 482, 485 (Tex. App.--Fort Worth 1990, writ denied)).

 First State's evidence included its officer's affidavit. The officer averred concerning
the unpaid balances owed under the notes after offsetting the foreclosure sale prices, itemized
accrued interest and incurred costs and fees, and the per diem interest charges. First State's officer
averred that the unpaid interest was $48,230.24 on Note 1 and $33,571.09 on Note 2 as of
February 18, 2009, and that the per diem interest charge was $6.06 per day on Note 1 and $32.36 per
day on Note 2. Kelly did not present controverting evidence, and the trial court's award of
"$166,838.46 as the amount due and owing as of February 18, 2009," tracks the officer's averred
total amount, including principal, interest, and costs, that was due and owing as of that date. The
trial court's award of $13,639.10 as additional prejudgment interest from February 18, 2009, until
the date of judgment is also supported by the officer's averred amounts of per diem interest charges. (7) 
We conclude that First State's uncontroverted evidence supports the trial court's awards of
$166,838.46 and $13,639.10.

 As part of this issue, Kelly also contends that the trial court erred in its award of
interest, urging that the statutory interest rate and the tolling provisions in sections 304.103 and
304.104 of the finance code apply. See Tex. Fin. Code Ann. §§ 304.103, .104 (West 2006). 
Section 304.103 provides that prejudgment interest is equal to the applicable postjudgment interest
rate at the time of the judgment, and section 304.104 of the finance code provides in relevant part:


 [P]rejudgment interest accrues on the amount of a judgment during the period
beginning on the earlier of the 180th day after the date the defendant receives written
notice of a claim or the date the suit is filed and ending on the day preceding the date
judgment is rendered. Prejudgment interest is computed as simple interest and does
not compound.



Id. § 304.104. Based upon sections 304.103 and 304.104, Kelly argues that he is not liable for any
interest post-maturity until at least the date suit was filed, and that any interest accrued at five percent
from that point forward. Id. §§ 304.103, .104. Kelly further contends that the guaranty agreements
must be strictly construed in his favor and that his guaranties do not contain contractual obligations
for the payment of post-maturity interest. See Vastine v. Bank of Dallas, 808 S.W.2d 463, 464 (Tex.
1991) ("Texas courts apply the rule of strictissimi juris in interpreting guaranty agreements to refrain
from extending the guarantor's obligation by implication beyond the written terms of the
agreement."); McKnight v. Virginia Mirror Co., 463 S.W.2d 428, 430 (Tex. 1971) (same).

 The plain language of the loan documents executed by Kelly, however, supports
First State's claims for interest at the rates provided in those documents, including post-maturity
interest. See Apache Corp., 294 S.W.3d at 168. Kelly's guaranty securing Note 1 provides:


 The indebtedness guaranteed by this Guaranty includes any and all of Borrower's
indebtedness to Lender and is used in the most comprehensive sense and means and
includes any and all of: Borrower's liabilities, obligations and debts to Lender, now
existing or hereinafter incurred or created, including without limitation, all . . .
interest . . . .


 The Guaranty will continue to bind Guarantor for all Indebtedness incurred by
Borrower or committed by Lender prior to receipt of Guarantor's written notice of
revocation, including any extensions, renewals, substitutions or modifications of
the Indebtedness.



The guaranty securing Note 2 similarly provides:


 [Kelly] guarantees to Lender the prompt and full payment of the Guaranteed
Indebtedness . . . , as and when the same shall be due and payable, whether by lapse
of time, by acceleration of maturity or otherwise, and at all times thereafter. . . . 


 The term "Guaranteed Indebtedness," as used herein, includes: (a) all sums now or
hereafter due and owing pursuant to the terms of that certain Promissory Note . . . and
the terms of the . . . Loan Documents; (b) interest on any indebtedness described in
(a) preceding; . . . and (d) any renewal, extension or rearrangement of the
indebtedness, costs, or expenses described in (a) through (c) preceding, or any
part thereof.



Kelly also agreed in the loan documents modifying both notes that "[m]atured unpaid principal and
interest shall accrue interest at the Maximum Rate." (8) See also Tex. Fin. Code Ann. §§ 303.001-.009
(West 2006). The plain language of the loan documents makes clear that Kelly was liable for interest
on the note balances at the interest rates provided in those documents, including post-maturity
interest. We overrule Kelly's fifth issue.







CONCLUSION


 Because we conclude that judicial estoppel does not apply and that First State's
evidence conclusively established its claim for a deficiency judgment against Kelly, we affirm the
summary judgment. (9)


 __________________________________________

 Melissa Goodwin, Justice

Before Chief Justice Jones, Justices Henson and Goodwin

Affirmed

Filed: December 30, 2011

1. In its motion to lift the automatic stay in the Primera proceeding, First Bank listed the
following outstanding liens on the properties:


 Cielo Circle Property:


 First State Bank Central Texas

 as of 8/10/07 $500,742.88 per diem $131.79

 Cambridge Custom Homes $ 48,000.00

 Floors, Inc. $ 1,100.00

 InterCrete, LLC $ 5,000.00

 Windsor Stucco Company $ 79,000.00

 Durango Doors, LLC $ 270.00-removable

 Ad Valorem Taxes (2006) $ 5,469.11

 

 Total: $639,581.99


 Lariat Property:


 First State Bank Central Texas

 as of 8/10/07 $254,670.39

 Accrued & Unpaid Interest $ 1,501.86 per diem $71.51

 Jimmy Evans Company $ 57,744.86

 Burrows Cabinets $ 7,333.33

 Shanrock Holdings $ 8,884.61

 Chasco Contracting $ 83,632.45

 

 Total: $413,767.50
2. To the extent Kelly relies upon cases in which judicial estoppel applied to the valuation of
property in bankruptcy based upon a bankruptcy debtor's conflicting valuations, we find those cases
inapposite. See, e.g., In re Victorian Park Assocs., 189 B.R. 147, 149-50 & nn.3, 4 (Bankr. N.D.
Ill. 1995) (concluding that no basis for applying judicial estoppel to debtor's changing position in
that case as to value of property over time but noting "judicial estoppel might be applicable to
valuation of property in bankruptcy" where "a party argues that an earlier valuation was wrong"); 
In re J.F.K. Acquisitions Grp., 166 B.R. 207, 210-11 (Bankr. E.D.N.Y. 1994) (finding debtor
judicially estopped from asserting lower value of property in bankruptcy proceeding in which debtor
had previously asserted significantly higher value for property and noting that denied creditor's
motion to lift automatic stay "[b]ased in no small part on the debtor's evidence" of value and that
debtor's "current position is grossly inconsistent with its prior position"). First State does not argue
that its represented fair market values to the bankruptcy court were wrong and continues to stand by
its representations here.
3. Addressing non-judicial foreclosure sales, the Saunders court noted:


 As one might expect, rarely is there truly competitive bidding at a nonjudicial
foreclosure sale. Typically, the lender is the only bidder. Other persons potentially
interested in the property will often negotiate with the lender for the purchase of the
property only after the fact, and frequently on financing terms offered by the lender.
This is so at least in part because foreclosure sales are expected to be consummated
for cash on the date of sale. Lenders are chary about "financing" a foreclosure
purchase lest they be accused of collusion, and are equally unwilling to accept less
than cash from a third party, lest the third party default after the fact, leaving the
lender to absorb the loss.


In re Saunders, 112 B.R. 844, 845 n.4 (Bankr. W.D. Tex. 1990).
4. Of course, section 51.003 of the property code limits a lender's ability to set the amount
of its recovery against a guarantor in a deficiency suit by allowing an offset when requested by the
guarantor based upon the property's fair market value at the time of the foreclosure sale. See Tex.
Prop. Code Ann. § 51.003 (West 2007).
5. To the extent Kelly argues that the waiver of his right to fair market valuation and offset
should be set aside as a matter of equity based upon his averments that he was not represented by
counsel or aware of the waiver when he signed the modification documents, Kelly fails to cite
authority for this proposition. See Tex. R. App. P. 38.1(i). In any event, absent a showing of fraud
or imposition, a party's failure to read an instrument before signing it is not grounds for avoiding it. 
In re Bank of Am., N.A., 278 S.W.3d 342, 345 (Tex. 2009). Kelly has not asserted fraud or
imposition here.
6. Section 51.005 of the property code provides that a guarantor may bring an action for a
determination of the fair market value of property after a foreclosure sale and seek an offset against
a deficiency claim. Tex. Prop. Code Ann. § 51.005 (West 2007). Once a lender brings suit pursuant
to section 51.003, this section does not apply. Id. § 51.005(a).
7. Calculating interest for 355 days, the approximate time period between February 18, 2009,
and the summary judgment hearing, by using First State's officer's averred per diem interest charge
for each note equals the trial court's award of additional prejudgment interest: ($6.06 per day *
355 days) + ($32.31 per day * 355 days) = $13,639.10.
8. The note modification documents define the maximum interest rate as the "highest rate of
interest permitted by applicable law . . . ; provided the Maximum Rate shall not exceed 18% or the
State usury ceiling, whichever is less."
9. Pending before this Court are First State's motion for leave to file post-submission brief
and its motion to file supplemental brief. We grant both motions.